THOMAS J. HOWARD, *Executor, in Equity, versus*
THE AMERICAN PEACE SOCIETY, *& als.*

Heirs at law are not to be disinherited by conjecture, but only by express words or necessary implication.

Extrinsic evidence is admissible to aid in giving a construction to devises or bequests in a will, and to show what property was intended to be devised, and what person was intended to take : —

1st. When the description of the thing devised, or of the devisee, is clear upon the face of the will, but upon the death of the testator, it is found that there are more than one estate or subject matter of devise, or more than one person, whose description follows out and fills the words used in the will; —

2nd. When the description of the thing intended to be devised, or of the person who is intended to take, is true in part, but not in every particular.

*Thus*, such evidence is admissible to show that by a bequest to "*The Congregational Society of Auburn,*" the testator intended "*The First Congregational Society in Auburn;*" and that by a bequest to "*The Congregational Foreign Missionary Society,*" the testator intended "*The American Board of Commissioners for Foreign Missions.*"

When the name used in a will does not designate with precision any person, and the circumstances concur to indicate that a particular person was intended, and no similar conclusive circumstances appear to distinguish any other person, the person thus shown to be intended will take.

The general provisions of the statute of charitable uses (43 Eliz., c. 4) are in force in this State, not as the basis of the equity power of the court in cases of trusts, but as incorporated into our chancery jurisprudence.

A bequest to "*the suffering poor of the town of Auburn*" is not void for uncertainty; nor because no trustee, to execute the trust, is expressly named in the will.

Under our statute (R. S. c. 87, sec. 8, par. 7) the Supreme Court is authorized to determine from all the provisions of a will, and from extrinsic evidence, whether the testator intended that the executor not expressly appointed trustee, should act as such.

Howard *v.* The American Peace Society.

A bequest to the Congregational minister of the Congregational society of the town of Auburn, absolute and subject to no contingency, there being none at the date of the will, will apply to the person who first became such in the legal sense of the term.

It will not be held to apply to a person who preaches to that society temporarily, but only to the regularly settled pastor.

BILL IN EQUITY to determine the legal construction of the will of Edward Crafts, which contains the following provisions :—

"1. I give and bequeath unto the Congregational Foreign Missionary Society one-third part of all my personal property.

"2. I do also give and bequeath unto the American Peace Society one-third part of my personal estate.

"3. I also give and bequeath unto the suffering poor of the town of Auburn one half of the remainder of my personal estate.

"And I further give the Congregational Society of Auburn the income of all my real estate.

"And lastly, as to the residue of my personal estate whatever, after payment of all my just debts, I give and bequeath the same to the Congregational minister of the aforesaid society of the town of Auburn.

"And lastly, I appoint Thomas J. Howard, the executor of this, my last will and testament."

The case is stated in the opinion. It was argued in writing, by *E. Shepley* for the American Board of Commissioners for Foreign Missions.

*S. & D. W. Fessenden,* for the heirs at law and the American Missionary Society.

*Shepley & Dana,* for the First Congregational Society in Auburn and the American Peace Society.

The opinion of the Court was drawn up by

TENNEY, C. J.—On May 29, 1850, Edward Crafts, of Auburn, executed his last will and testament, in which he made certain devises and bequests, as set forth specifically

in the bill, and appointed the plaintiff the executor of the same.

On June 15, 1852, the will was admitted to probate by the Judge of Probate, for the County of Cumberland, as the last will of said Edward Crafts, and the plaintiff was duly appointed executor thereof, and entered upon the discharge of his trust by giving bond according to law.

An appeal was taken by some of the heirs at law of the testator, from the decree of the Judge of Probate, approving said will, to the Supreme Judicial Court, and they prosecuted their appeal therein, upon which such proceedings were had that the instrument was adjudged and decreed to be the last will and testament of Edward Crafts.

This is a bill in equity brought by the executor, as such, in which he prays that the respective rights and interests of the parties claiming under the will may be adjusted and determined; and he shows that he has proceeded in the settlement of the estate, and holds in his hands a balance amounting to the sum stated in the bill that remains to be distributed, after paying all the claims, which have been presented against the estate, and that, at the decease of the testator, he was seized and possessed of certain parcels of real estate, situate in the State of Maine, as described in the inventory of the estate.

And the plaintiff says, that, owing to the uncertain terms in which the will of the testator is expressed, the intention of the testator is a matter of doubt, and that he cannot safely pay over or deliver to any person or corporations the legacies and bequests named in the will, until it is settled, upon a full examination of the several matters, who is justly entitled thereto.

The plaintiff charges, that the " American Board of Commissioners for Foreign Missions," a corporation, whose office is at Boston, claim to be the legatees named in the first clause in said will, wherein one-third part of the personal property of the testator is bequeathed to the "Congregational Foreign Missionary Society." And that the Ameri-

can Peace Society," a corporation, whose office is at Boston, claim one-third part of said personal estate, under the second clause of the will. And the plaintiff and others, selectmen and overseers of the poor of the town of Auburn, claim that they, or some trustee, to be appointed by the Court for that purpose, are entitled to one-sixth part of said personal estate, under the third clause of the will, to hold the same in trust for the suffering poor of the town of Auburn, or that the executor should hold the same as trustee to execute the trust aforesaid; and the plaintiff further shows, that the "First Congregational Society in Auburn," a religious society, incorporated under the provisions of the statutes of Maine, claim to be the devisee in fee, under the fourth clause of the will. And that Rev. John Elliot of Auburn, and the Rev. Thomas N. Lord, each, severally claim to be the residuary legatee under the last clause of the will. And the plaintiff further charges that Martha Howard, and others named, claim as heirs at law of the testator, that some or all of the devises and bequests in the will are invalid and void for uncertainty, and that they are entitled to a residue of said estate, which they claim as not having been specifically devised or bequeathed by any valid and certain provision in the will.

None of the heirs at law of the testator are named in the will as devisees and legatees therein. The heirs at law are not to be disinherited by conjecture, but only by express words, or necessary implication. *Thomas* v. *Thomas*, 6 Term Rep. 671.

It is perceived, from the foregoing, that the "American Board of Commissioners for Foreign Missions" claim the bequest made to the "Congregational Foreign Missionary Society," and that the "First Congregational Society in Auburn" insist that that society is intended by the name of the "Congregational Society of Auburn," as it appears in the will, and that John Elliott and Thomas N. Lord, severally claim to be residuary legatees in the will, as the Congregational minister of the aforesaid society, of the town of

Auburn.    And that the selectmen and overseers of the poor of Auburn are the trustees, to represent the "suffering poor of said Auburn," as the *cestuis que trust*.

Certain legal rules have been adopted by Courts in such cases, as are here presented, touching the admission and exclusion of parol evidence, to aid in giving a construction to devises and bequests in a will, and the effect of such evidence as is competent.

In the case of *Miller* v. *Travers*, 8 Bing., 244, it is said, by TYNDAL, J.,—"It may be admitted, that in all cases in which a difficulty arises, in applying the words of a will to the thing which is the subject matter of the devise, or to the person of the devisee, the difficulty or ambiguity which is introduced by the admission of extrinsic evidence, may be rebutted and removed by the production of further evidence upon the same subject, calculated to explain what was the estate or subject matter really intended to be devised, or who was the person really intended to take under the will; and this appears to us to be the extent of the maxim, "*Ambiguitas verborum latius, verificatione suppletur.*" But the cases to which this construction applies will be found to range themselves into two separate classes, distinguishable from each other.    The first is where the description of the thing devised, or of the devisee, is clear upon the face of the will; but, upon the death of the testator, it is found that there are more than one estate or subject matter of devise, or more than one person, whose description follows out and fills the words used in the will.    As where the testator devises his manor of Dale, and, at his death, it is found that he has two manors of that name, South Dale and North Dale; or, where a man devises to his son John, and he has two sons of that name.    In each of these cases respectively, parol evidence is admissible to show which manor was intended to pass, and which son was intended to take.    The other class of cases is that in which the description contained in the will of the thing intended to be devised, or of the person who is intended to take, is true in

part but not in every particular.   As when an estate is de-
vised, called A, and is described as in the occupation of B,
and it is found that, though there is an estate called A, yet
the whole is not in the occupation of B ; or, where an estate
is devised to a person whose surname or christian name is
mistaken, or whose description is imperfect or inaccurate ;
in which latter class of cases, parol evidence is admissible
to show what estate was intended to pass, and who was the
devisee intended to take, provided there is sufficient indica-
tion of intention appearing on the face of the will to justify
the application of the evidence."

The foregoing rules are supported by the authority of
cases previously adjudged.   In *Dean* v. *Page*, referred to
in the case of *Hay* v. *Earl of Coventry*, the Court held,
"that sufficient did not appear on the face of the will, to
warrant them in saying that an estate of inheritance was
given to the daughter ; that, if it were left to conjecture,
they might suppose that some mistake might be made in the
limitation, but they would not determine on conjecture, or
put into the testator's mouth what he had not said."

In 4 Russ. Rep., 581, it was held that "evidence of col-
lateral circumstances was admissible, as of the ages of sev-
eral devisees named in the will ; of the fact of their being
married, or unmarried and the like, for the purpose of as-
certaining the true construction of the will.   But it is very
clear that such evidence is not admitted to introduce new
words into the will itself, but merely to give a construction
to the words used in the will consistent with the real state of
his property and family.   The evidence is introduced to
prove facts, which, according to the language of Lord COKE,
8 Rep., 155, stand well with the words of the will."

It is a maxim of the law in such matters that *falsa dem-
onstratio non nocet*, "but," says Lord KENYON, in *Thomas*
v. *Thomas*, before cited, "I have always understood, that
such *falsa demonstratio* should be added to that which was
sufficiently certain before."

The rule laid down by ANDERSON, C. J., in Gadb. Rep.,

131, is, "an averment to take away surplusage is good, but not to increase that which is defective in the will of the testator."

The cases of *Standen* v. *Standen*, 2 Vesey, Jun., 589, and *Selwood* v. *Mildmay*, 3 Vesey, Jun., 306, illustrate the rules which have been referred to, where parol evidence is admissible.

In the case of *Beaumont* v. *Fell*, the name of the legatee was mistaken. The testator gave a legacy to Catherine; it turned out there was a person whom he frequently called Gatty, and not according to her real name, which was Gertrude; and, when parol evidence of that was received, it left no doubt but that the testator meant Gatty. *Thomas* v. *Thomas*, before cited, 676, 677.

It is said, in *Miller* v. *Travers*, 8 Bing., 244, "an uncertainty which arises from the applying the description contained in the will to the thing devised, or to the person of the devisee, may be helped by parol evidence; but that a new subject matter of devise, or a new devisee, when the will is entirely silent upon either, cannot be imported by parol evidence into the will itself."

In the case of *Allen* v. *Allen*, 12 Adolph. & Ellis, 451, it was held that parol evidence of the declarations of the devisor, that she had left her property to her grandson, who had only one brother and sister, were admissible to show which grandson should take under the devise. And it was no objection to such evidence, that the declarations were subsequent to the making of the will. In the opinion of the Court, Lord DENMAN, C. J., says, — "It is within the very terms of the only case in which, according to the opinion of the Court of Exchequer, thrown out in their judgment in *Doe dem, Hiscocks* v. *Hiscocks*, declarations of the testator can be received in evidence of intention. In the whole list of cases on this subject, no one can be found in which such evidence, under such circumstances, has been excluded."

It is believed that the authorities in this country, which

have been relied upon by both sides in argument, are in har-
mony with the English doctrine on this subject, which has
been adverted to in the cases cited.   In the case of *Tucker*
*& als., Ex'rs,* v. *Seaman's Aid Society & als.,* 7 Met., 188,
where the same matter is very fully discussed by C. J.
SHAW, with his usual ability, in giving the opinion of the
Court, he says, — "In general, no extrinsic evidence of the
intention of the testator is admissible to control or alter the
written provisions of a will.   It would be contrary to the
general rule of the common law, viz. : that when a party
has expressed his contract or his testament in writing, duly
executed, such writing is in its nature better evidence of his
intentions than any extrinsic evidence could be.   But anoth-
er and more conclusive reason is, that the law requires a will
to be executed in the presence of three witnesses, and with
other solemnities, calculated to insure correctness and guard
against mistake and imposition."

Again, it is said in the same case, "the general rule cer-
tainly is, that the intent of the testator is to govern in the con-
struction ; but it is the intention expressed by the will, and
not otherwise.   To get at the intention expressed by the
will, every clause and word are to be taken into considera-
tion, because one clause is often modified and explained by
another ; every implication and every direct provision is to
be regarded.   And further ; as a will must necessarily ap-
ply to things external, any evidence may be given of facts
and circumstances which have any tendency to give effect and
operation to the words of the will ; such as the names, de-
scriptions and designations of persons, the relations in which
they stood to the testator, the facts of his life, as having
been single or married one or more times, having had chil-
dren by one or more wives, their names, ages, places of
residence, occupation ; so of grandchildren, brothers and
sisters, nephews and nieces, and all similar facts.   If then,
when the will comes to be thus applied, there is no reason-
able doubt as to the person and things intended, there is no
room for any further admission of evidence to show the in-

tent of the testator." "If, in the matter of description, there is a mistake, that is, if there is no one who corresponds to the description, in all particulars, but there is one who corresponds in many particulars, and no other who can be intended, such person will take."

" Still, however, there is a well defined class of cases, wherein extrinsic evidence of the actual intention of the testator is admissible, which is that of equivocation or latent ambiguity." " But when the will clearly describes a particular estate, and names a person in being, who is the object of the testator's bounty, it was early held as a legal construction of the statute, that, from the *necessity* of the case, extrinsic evidence must be admitted to show which was intended."

" The principle established by the cases is, that the estate must pass by the will. If the will applies definitely to two or more persons, so that either would be entitled to take it, under the will, but for the existence and claim of the other, then parol evidence is admissible to prove which was intended. When that proof is supplied, the will operates by its own force and terms, to give the property to that one as if such person had been the only one named or described. The evidence does not create the gift, but simply directs it."

It remains to apply these principles to the devises and bequests in the will, and to the legal evidence in the case.

The bequest to the " American Peace Society," is to a body corporate of that name, which existed at the time the will was executed, and, for aught which appears to the contrary, continues its existence to the present time. No question is made of the right of this corporation to take under the will, but all interested in that legacy consent thereto.

The " First Congregational Society in Auburn" appears to have been formed as a corporation by virtue of the statute of 1841, c. 18, § 1, in the year 1844. It is objected, however, in behalf of the heirs at law of the testator, that the first meeting was not held according to the provisions of that Act, inasmuch as the place and time of that meeting

was not named in the notice therefor. On inspection of the records, this objection does not rest upon any fact. The return of the notice given by the person directed to notify the parties interested, refers to another paper, and that paper was the warrant, manifestly on the same sheet on which the return was made. By authority of the statute, the warrant and the return of notice, the meeting was held and the parish organized, pursuant to the statute, under the name of the "First Congregational Parish in Auburn." In the constitution subsequently adopted and signed by the members of the parish, according to the statute, the corporation was to be known as the "First Congregational Society in Auburn." The records of this society, of which copies have been introduced from its first formation, to the latter part of the year 1858, show that the organization has been kept up, and the existence of the society continued. And it appears also, that on May 29, 1850, the day on which the will was executed, the society had a place for regular meetings and of worship.

The evidence shows that, at the time of the execution of the will, there was no other Congregational society in the town of Auburn, excepting the one referred to in the copies of the records. There being no other claimant for this bequest, the case is analogous to that of *Minot & al., Ex'rs.,* v. *The Boston Asylum and Farm School for Indigent Boys & als.,* 7 Met., 416, where the defendants were held to be entitled to the devises and bequests made to the "Boys' Asylum and Farm School." "The First Congregational Society in Auburn" are adjudged and decreed to have been intended by the testator in the bequest to the "Congregational Society of Auburn," and are entitled to take accordingly.

It is proved that the "American Board of Commissioners for Foreign Missions," is a corporation, created by the Legislature of Massachusetts more than thirty-five years ago, having its principal place of business in Boston, in the Commonwealth of Massachusetts, and has done a large

amount of business; has been employed to obtain and receive donations, and to appropriate them to impart the Holy Scriptures to unevangelized nations, and for the support of persons to teach and preach the gospel in foreign lands, and to labor there as missionaries, and for purposes connected therewith. That the society has, during that time, by its own agents, by ministers of the gospel, and others, made known extensively its proceedings and wants, and has solicited donations and received bequests from Congregational churches and societies, and their members. That there did not exist within the United States, on or before May 29, 1850, any society or association, known or designated as the "Congregational Foreign Missionary Society;" and that the American Board has received donations from the Orthodox Congregational societies in Auburn, Lewiston, and Minot.

It is further proved, that the plaintiff in this bill prepared the will, which was executed by the testator on May 29, 1850,— that, before that time, he and the testator had known of the existence of a society and its proceedings, as employed to obtain and receive donations from Congregational societies or churches, or from their members, and to appropriate them to the support of foreign missions, so far that a collection for the support of foreign missions was taken up monthly in the "Congregational Society in Auburn," and the wants and proceedings of such society had been made known publicly to the Congregational societies in Auburn and Minot; that the Congregational meeting house in Auburn was distant from the testator's residence about seventy-five rods, and a part of the time about twenty rods; the meeting house in Minot about three miles, and the meeting house in Lewiston five or six miles from the testator's residence. That the plaintiff and testator, before the execution of the will, had had conversation together touching such society and its proceedings, which was known to the latter. That the plaintiff had no knowledge of any other society as soliciting and receiving donations from Congregational societies, or their members, for the support of

foreign missions, nor did he know that the testator had any such knowledge. That the plaintiff was desired by the testator to insert a clause in his said will for the purpose of giving one-third of all his personal property to the society, whose proceedings, as before mentioned, had become known to him, and, in compliance with such desire, the plaintiff did insert the first bequest in said will as it was executed by him. That, at that time, the corporate name of such society had not been made known to the plaintiff, nor did he know that the testator had knowledge thereof. That, at the time the plaintiff drew the will of the testator, the testator spoke of the foreign missionary cause as being a worthy object, and what money he had, he said, he thought he had a right to dispose of as he thought proper; he also spoke of the "Congregational Foreign Missionary Society" in contradistinction to the missionary societies of the Methodists and the Baptists, which he named.

From this evidence alone, we should entertain no doubt that the American Board of Commissioners for Foreign Missions was intended by the testator. But it is shown that the form of church government in the Calvinistic Baptist churches is congregational, and that among them are two Foreign Missionary Societies, one at the North and another at the South. The former, called the "Baptist Missionary Union," has existed many years and has for its object a work very similar to that of the "American Board"; but we are satisfied, from the evidence, that it has never been styled a "Congregational Foreign Missionary Society;" nor are their churches known by the name of "Congregational churches." It has been further shown that there is in New York a corporation called the "American Missionary Association," having for its object the receiving and distributing of moneys, contributed for missionary purposes in this country, and in foreign lands, for the publication of a paper entitled the "American Missionary," and other papers and pamphlets of a missionary character, and for the propagation of the gospel of Christ, in its peaceful and anti-slavery character.

The principal place of business is in New York. That it was a voluntary association from Sept., 1846, to Feb. 1, 1849, when it became a body corporate; that it has transacted a large amount of business yearly; that, since its incorporation and before, it has been employed to obtain and receive donations, and to appropriate them to impart the Holy Scriptures to unevangelized nations, and to support persons to teach and preach the gospel in foreign countries, and to labor there as missionaries; and that it has procured the scriptures to be distributed and the gospel to be preached in this country as in foreign and unevangelized ones. That, during the period mentioned, the association, by its own agents, ministers of the gospel and other persons, have made known extensively through the whole of the free States, excepting California, and some of the slave States, the employment of the association, and has solicited donations from . Congregational societies and churches, and received donations and bequests from their churches and societies. That, before May 29, 1850, the association had received donations from persons in North Auburn, the sum of two dollars and fifty cents; and, from persons and Congregational churches and societies in a large number of other towns in the State of Maine, other donations. That the donation from Lewiston Falls was from the "Female Anti-Slavery Society," in Sept., 1848, and consisted of clothing, valued at seven dollars. That soon after the organization, in 1846, the association began to publish and has ever since continued to publish a monthly paper, called the American Missionary, setting forth, among other things, the objects, doings and necessities of the association, which has been extensively circulated.

It is very manifest that, at the time of dictating his will, the testator did not intend that the bequest to the "Congregational Foreign Missionary Society," should be for the benefit of any Methodist or Baptist society, inasmuch as the subject of this bounty was expressly contra-distinguished from the latter societies.

But it is insisted, that there is an uncertainty whether the American Board, or the American Missionary Association was intended by the testator, in the clause which we are now considering, to such an extent, that the bequest must be treated as void for that reason.

This, then, may be regarded as a case where the name used in the will does not designate with precision any person or corporation. We must then apply the rule before adverted to, that "when the circumstances come to be proved, so many of them concur to indicate that a particular person was intended, and no similar conclusive circumstances appear to distinguish and identify any other person, the person thus shown to be intended will take."

It is very clearly proved that, before the execution of the will, the testator had known of a society and its proceedings, which obtained donations from Congregational churches, to support foreign missions, and that monthly collections were taken in the Congregational society in Auburn, and that the wants and proceedings of such society had been made public in the Congregational societies of Auburn and Minot, both of which were near the residence of the testator; that he had spoken of the proceedings and wants of such society, for the benefit of which he caused the bequest, that we are now considering, to be inserted in the will. And it is proved that the American Board had received, before May 29, 1850, for many years, donations from the churches and societies in Auburn, Lewiston and Minot, thus identifying the society whose wants and proceedings had been made known to the testator, with that board.

No evidence is adduced that the testator had any knowledge of the "American Missionary Association," or a society corresponding therewith, in its objects and efforts.

It is very manifest that the testator entertained the intention to bestow his bounty upon a missionary society, whose purpose was to spread the gospel in foreign countries. This is the distinguishing object of the American Board, and, from the evidence, we infer, that the legitimate opera-

tions of that society are confined thereto. On the other hand, the American Missionary Association has the purpose of propagating the gospel, not only in foreign lands, but in our own country, "in its peaceful and anti-slavery character." Hence, with greater propriety can the American Board be called a "Foreign Missionary Society," than can the "Missionary Association." We have no evidence that the testator was disposed to appropriate means for home missionary enterprises, or for the lessening of the evils of slavery.

When all the evidence is examined, we cannot doubt that the "American Board of Commissioners for Foreign Missions" was the society intended by the testator as the legatee, in the first bequest in his will, being a body corporate, well known in its various action for foreign missionary purposes, though its corporate name had not come to his knowledge. And it is adjudged and decreed accordingly.

The third bequest in the will, "unto the suffering poor of the town of Auburn," though not the subject of argument, in behalf of the persons referred to, demands the attention of the Court. In the preamble of the statute of 43 Elizabeth, c. 4, generally denominated the statute of charitable uses, among the uses enumerated as charitable, are gifts, devises, &c., for the relief of aged, impotent and poor people. And it has been decided in this State, that the general provisions of this statute are in force here. The jurisdiction, however, of this Court, over trusts, is derived from R. S. of 1841, c. 96, § 10, and R. S. of 1857, c. 77, § 8, and hence the provisions of the statute of Elizabeth are not the basis of the equity power in cases of trusts, and the Court is not restricted thereby, but the statute is rather incorporated into our chancery jurisprudence. *Tappan* v. *Deblois*, 45 Maine, 122.

Is this bequest void for uncertainty, and does it fail because no person is named in the will as having the express power to execute the trust implied? It cannot be doubted, that the testator, at the time he dictated his will, had in his

mind a distinct class of persons, who should be the objects of his bounty, as their necessities, expressed in the will, should from time to time be disclosed. And this class, in his contemplation, was composed of those who should be compelled to submit to privations, but who were not expected by him to seek or receive relief under the pauper laws of the State. If he had reference to the class last referred to, the bequest would really be to the town of Auburn, in its corporate capacity, and would not be for the benefit of those, who, from feelings of sensibility or other causes, would prefer want, to some extent, to aid from public charity, and who were really intended by him. This provision in the will was the result of a laudable desire to supply the wants of those in a humble pecuniary condition, and prevent the necessity for a call upon the municipal authorities to relieve their sufferings; and should not fail, unless for substantial reasons.

The case of *Attorney General* v. *Syamfer*, 1 Vern., 224, was where the testator gave £1000 to such charitable purposes as he had, by another writing, directed. The paper referred to was lost, so that the bequest stood as a gift to charitable uses. The trust was established, and the direction to a particular object left with the king, as *parens patriæ.*

Ann Cane made her will, and, after making several bequests therein, gave all the rest and residue of her personal property unto James Vaston, to such charitable uses as he should appoint, recommending poor clergymen who had large families and good moral characters. James Vaston died in the lifetime of the testatrix. The charity was sustained and executed by the Court, the Lord Chancellor saying, "the most general gift to charitable purposes has been decreed to be carried into execution, and the trustee, not being alive to administer the charity, cannot defeat the intention. Here she has pointed out clergymen as the objects of her bounty, which is sufficiently distinct." *Moggridge* v. *Thackwell & als.*, 3 Bro. C. C., 517.

The case of *White* v. *White & al.*, 1 Bro. C. C., 12,

was where the testator gave a moiety of the residue of his property to such lying-in hospital as his executor should appoint. The Lord Chancellor remarked, — "I remember to have read a case somewhere, where a legacy was given to B, for the benefit of non-conforming ministers, with the advice of C and D. At the testator's death, B, C and D were all dead, yet the Court sustained the legacy." And it was referred to a master to see unto which of the lying-in hospitals it was fit it should be paid.

A bequest was made to the poor inhabitants of St. Leonards, and the trust was supported. *Attorney General* v. *Clark*, Ambler, 422. The same was done where the gift was to poor dissenting ministers, living in any county. *Waller* v. *Childs*, Ambler, 524.

The Court of Chancery will aid a defective conveyance to legal charitable uses. *Case of Christ's College, Cambridge*, 1 W. Black., 91.

The same general question was considered by the Supreme Judicial Court of Massachusetts, when the District, which is now the State of Maine, was a part of that Commonwealth, in the case of *Bartlett & al.* v. *King*, 12 Mass., 537. And it was held, that a bequest to promote the propagation of christianity among the heathen, to persons who at the time constituted a voluntary association, and in trust for pious and charitable uses, was not void, as against public policy, for uncertainty; nor for the reason that there was no Court in Massachusetts at that time to compel the execution of such a trust. It was remarked, by DEWEY, J., who delivered the opinion of the Court, that "it does not seem to be necessary that there should be any particular or certain persons designated, who are strictly *cestui que trust*, in the common use of the term." "In trusts of this kind, the individuals who are ultimately benefited, are always uncertain. All the certainty required is a general description or limitation, and not a particular description of the individuals. On this ground, therefore, we do not perceive any more difficulty in giving effect to the bequest, than exists in

all cases, of donations to charitable uses; whether given to trustees directly, or in trust for other trustees, to be expended in promoting the objects for which they are given."

. *Going* v. *Emery*, 16 Pick., 107, was a case where a residue of the testator's estate, after making certain devises and bequests, was bequeathed to the cause of Christ, for the benefit and promotion of true evangelical piety and religion. It was held that, by virtue of the statute of 43 Eliz., c. 4, the devise was not void for uncertainty.

The will of the late Mary Preble was before this Court, in the case of *Deering* v. *Adams*, 37 Maine, 264, and in a certain contingency the estate of the testatrix was given and appropriated to constitute a fund, the interest of which was to be applied for the benefit of the poor of Portland and vicinity. This part of the will is adverted to in the opinion of the Court, and no suggestion made that the devise would be void for uncertainty.

The authorities, which have been referred to, well sustain the bequest to the suffering poor of the town of Auburn; so that it cannot be treated as void for uncertainty.

We now advert to the other inquiry, whether this bequest must fail because no trustee is named in the will, and because there is no indication that one should be appointed to take charge of the fund. Assuming this to be true, the authorities cited fully establish the doctrine, that the bequest shall not therefore fail, and in addition, on this point, we refer to the following : — *Saunderson* v. *Stearns*, 6 Mass., 37 ; *Stone* v. *Hobart*, 8 Pick., 464 ; *Hall* v. *Cushing*, 9 Pick., 395 ; *Nash* v. *Cutler*, 19 Pick., 67.

An important question is now presented in relation to the duty of the plaintiff, as the executor of the will, touching this bequest. The donation is limited to a class of persons who are designated in such a mode that they can be ascertained by their pecuniary condition alone. To make the provision effectual, some one must perform this duty. Persons may be found in the town of Auburn, who would be legitimately embraced in the provision, and such may be

their situation, that the relief from their sufferings might require the whole amount referred to in the will. In such case, the entire legacy might not be improperly distributed at once. But if this should not be found to be the state of this class of individuals, no violence is done to the language of the will by giving it such a construction, that the fund provided may be invested and the income distributed according to the . testator's general direction; or, if no persons should be found answering to his description of persons, the fund might accumulate.

The statute provides, in c. 87, § 8, head 7, that this Court have equity jurisdiction to determine the construction of wills, and whether an executor, not expressly appointed a trustee, becomes such from the provisions of the will. It is very manifest that some designation of individuals must be made. If this is not to be done by the executor, it must be by a person appointed a trustee, to execute the trust.

In looking at the whole will, and to the evidence in the case, it cannot be doubted that the testator had confidence in the ability, judgment and discretion of his executor. If it should be found that it would be proper, in the opinion of the executor, for the reasons before stated, that this donation should be passed at once to the suffering poor of the town of Auburn, he might, with propriety, discharge his duty by the distribution of the whole sum. If otherwise, he might make the investment and distribute the income and, perhaps, a portion of the principal, till the aggregate should reach the whole, as circumstances might require. And we are of the opinion that the testator intended that his executor should execute this trust.

We have seen that two individuals claim as residuary legatees under the will, each the whole of the residuum, as the "Congregational minister" of the "Congregational Society of Auburn."

It appears from the evidence that no one was holding such a relation to that society, in any sense of the term, at the time the will was executed. Hence, the testator cannot be

supposed to have had in his mind any particular individual. And it follows from this that this provision had respect to a time then future, when there should be a minister of that society; and, it being absolute and subject to no contingency, whenever it should vest, it must apply to the one who should be the minister of the society, and who should first become such in the legal sense of the term.

The Rev. John Elliot claims this legacy. It appears, by evidence in the case, that he commenced to preach to that society the first of March, 1850, and continued to do so, till about the first of August, 1851. The only reference to him in the records of the society, is a vote passed at its meeting on August 24, 1850, which is as follows:—"Voted, that we instruct our committee to extend an invitation to Rev. Mr. Hawes, to preach two Sabbaths, also employ Rev. (Mr.) Elliot to preach until we can obtain some other man, or until we can agree on some other person to settle with us." It cannot be supposed that Mr. Elliot was the minister of the society, in the opinion of the testator, for, if he were such, the bequest, it would seem, would be made to him by name, as Mr. Elliot was employed there when the will was executed.

Rev. Thomas N. Lord also claims, as residuary legatee, under the will. The evidence shows that he was the acting *pastor* of the church and society of the "First Congregational Society in Auburn," for six years preceding July, 1857, and the settled pastor since October, 1858, and that he was installed as such on October 27, 1858. By the records of the society it appears, that the society was duly notified that a meeting thereof would be holden on October 13, 1851, and one article was to see if the parish will coincide with the First Congregational Church in Auburn, in extending a call to Rev. Thomas N. Lord, to become their pastor. And, at the meeting so notified, it was voted to concur with the First Congregational Church in Auburn in extending a call to Rev. Thomas N. Lord to become their pastor.

The records show also, that, upon proper notice, a meeting of the society was held on Oct. 19, 1858, to act upon the following articles in the call, among others,—"To see if the society will concur with the church, in extending a call to Rev. Thomas N. Lord, to become their pastor," and "to see if the society will choose a committee to act in concert with the committee in calling a council for installation of the Rev. Thomas N. Lord." And it was voted, that the society concur with the church in extending a call to Rev. Thomas N. Lord to become their pastor, and chose C. S. Packard a committee in behalf of the society to act in concert with the committee in calling a council for the installation of the Rev. Thomas N. Lord.

It appears further from the records, that a meeting of the society was duly called, to be holden on Dec. 25, 1854, and, among other things, was the article in the call to see if they will give their agent, Mr. Asa Holmes, any further instructions relative to the late Edward Crafts' bequest, made and pertaining to the minister of the First Congregational Society of Auburn, and at the meeting it was voted,—"Agreeably to notice, instructed Mr. Asa Holmes, agent of said society, to present the claims of Rev. T. N. Lord, to the proper authorities, in behalf of the bequest to him, by the late Edward Crafts of Auburn, deceased."

The records disclose no invitation to any other person to become the pastor of the church and society, or either, from the date of the will to the installation of Mr. Lord, and there is nothing in the records, or evidence, that, during that time, any other person was recognized by the church or society as being the minister of that society.

Rev. Thomas N. Lord, we think, is entitled to take under this clause of the will, and it is so decreed.

RICE, APPLETON, GOODENOW, DAVIS and KENT, JJ., concurred.