EUGENE B. HINCKLEY, executor, *vs.* SUSAN C. THATCHER
& others.

Suffolk. March 18, 19. — June 22, 1885. W. ALLEN, COLBURN, & HOLMES,
JJ., absent.

A testator by his will gave the residue of his estate "equally to the Authorized
Agents of the Home and Foreign Missionary Societies to aid in propagating
the Holy religion of Jesus Christ." *Held,* that extrinsic evidence of the facts
known to the testator at the time he executed the will, the names by which he
was accustomed to call the missionary societies, or by which they were usually
called and known in the religious society with which he worshipped, the inter-
est shown by him in any particular missionary society, and the contributions
which he made for missionary purposes, was admissible to aid in identifying
the societies intended by the will.
A bequest to a missionary society, "to aid in propagating the Holy religion of
Jesus Christ," is a good charitable bequest.

BILL IN EQUITY, filed July 1, 1881, by the executor of the
will of Henry Knox Thatcher, against the next of kin of the
testator and the Attorney General, to obtain the instructions of
the court as to the construction of the residuary clause in said
will, which was as follows:

"I also will and desire that the residue of my property, if
any, after paying my funeral expenses and just debts, as well
as all before-named bequests, be given equally to the Authorized
Agents of the Home and Foreign Missionary Societies to aid
in propagating the Holy religion of Jesus Christ."

The answer of the Attorney General averred that the residu-
ary bequest was valid, and that the court should inquire which
of the following societies was intended: The American Board
of Commissioners for Foreign Missions, incorporated in Massa-
chusetts, and having its office in Boston. The American Home
Missionary Society; office in New York. American Baptist
Missionary Union; office in Boston. American Baptist Mission
Society. Freewill Baptist Foreign Mission Society; located in
Boston. Freewill Baptist Home Mission Society; office in
Rhode Island. Society for Promoting Christian Knowledge,
Piety, and Charity; office in Boston (not having foreign mis-
sions). The Domestic and Foreign Missionary Society; office
in the city of New York. Missionary Society of the Methodist

Episcopal Church; office in New York. Board of Church Extension of the Methodist Episcopal Church; located in Philadelphia. The Board of Foreign Missions of the Presbyterian Church in the United States of America; located in New York. The Board of Home Missions of the Presbyterian Church in the United States of America; located in New York.

The answer of the next of kin averred that the residuary bequest was void for indefiniteness and uncertainty, both as to the purposes to which it was to be applied, and as to the persons or societies to whom it was to be given, or through whom it was to be applied.

The following corporations appeared and claimed to be respectively the legatee intended, and were made parties defendant: the American Board of Commissioners for Foreign Missions; and the American Home Missionary Society. The Missionary Society of the Methodist Episcopal Church and the Massachusetts Home Missionary Society also appeared as claimants.

The case was heard, before C. Allen, J., and the evidence was taken by a commissioner, under the 35th rule in chancery. The judge ordered a decree to be entered " that the testator mentioned in the bill did not, under the description in his will of the 'home and foreign missionary societies,' intend either of the defendants the American Home Missionary Society and the American Board of Commissioners for Foreign Missions, or of the claimants, the Massachusetts Home Missionary Society and the Missionary Society of the Methodist Episcopal Church, or any particular society or societies, and the claim of each of the said societies to be a society intended by the said testator under the said description is hereby disallowed and dismissed. And it is further ordered, adjudged, and decreed, that the gift in the said will of the residue of the testator's estate equally ' to the Authorized Agents of the Home and Foreign Missionary Societies to aid in propagating the Holy religion of Jesus Christ,' is a valid, charitable gift, and ought to be applied equally to home missions and to foreign missions, according to a scheme to be directed by the court."

From this decree, the next of kin, the American Board of Commissioners for Foreign Missions, and the Massachusetts Home Missionary Society, appealed to the full court.

*M. A. Fowler* (of New York) *& J. L. Thorndike,* (*F. C. Welch* with them,) for the next of kin.

*R. R. Bishop & G. Wigglesworth,* for the American Board of Commissioners for Foreign Missions, and the Attorney General.

*J. N. Marshall,* for the Massachusetts Home Missionary Society.

FIELD, J. Henry Knox Thatcher died on April 5, 1880, leaving a will, which was executed on March 18, 1870, and was written by himself. The first clause of the last article of the will is as follows: "I also will and desire that the residue of my property, if any, after paying my funeral expenses and just debts, as well as all before-named bequests, be given equally to the Authorized Agents of the Home and Foreign Missionary Societies to aid in propagating the Holy religion of Jesus Christ."

In the original will the word "Home," and the words "Foreign Missionary Societies" begin with a capital letter. There is nothing else in the will that affords any aid in construing this clause, unless it be thought that the declaration in the first clause of the will might aid the court in determining what the testator meant by "the Holy religion of Jesus Christ," if it becomes necessary to determine it. That declaration is as follows: "Realizing the uncertainty of human life, which by the blessing of my Heavenly Father I have been permitted to enjoy for so long a time, and acknowledging my firm belief in Him, and in the efficacy of the atonement of His Son, our Lord and Saviour Jesus Christ, and with the hope of the final salvation of my immortal soul through His merits, and being of sound mind and memory, I declare this instrument to be my last Will and Testament."

The two principal questions argued are, first, whether the Home and Foreign Missionary Societies intended by the testator can be identified; and secondly, if they cannot be, whether this is a valid charitable bequest. One question of evidence has been argued, which is, whether evidence of the testator's religious opinions at the time he executed the will is admissible, either for the purpose of identifying the societies, or of showing what the testator meant by "the Holy religion of Jesus Christ."

The case is one in which no society or societies are shown to exist which conform accurately to the name or description contained in the will; and such cases as *Tucker* v. *Seaman's Aid Society*, 7 Met. 188, need not be noticed.

In *Shore* v. *Wilson*, 9 Cl. & Fin. 355, it was left undetermined whether the religious opinions of Lady Hewley could be shown for the purpose of determining the meaning of the words "Godly preachers of Christ's holy Gospel," contained in her deed of 1704. "The evidence which goes to show the existence of a religious party, by which the phraseology found in the deeds was used, and the manner in which it was used, and that Lady Hewley was a member of that party," was held admissible, and sufficient to support the decision. (p. 550.) A majority of the judges, however, whose opinions were taken by the House of Lords, advised that evidence of the religious views of Lady Hewley could not be considered except for the purpose of show-ing her connection with a religious denomination the members of which used the words in a restricted sense, and the House of Lords intimate that such is their opinion. See *Drummond* v. *Attorney General*, 2 H. L. Cas. 837; and *Charter* v. *Charter*, L. R. 7 H. L. 364. But in carrying into effect, by means of a scheme, a charitable bequest for religious purposes, when the terms of the gift are indefinite, it seems that the religious opin-ions of the donor are sometimes regarded in England. *Attorney General* v. *Calvert*, 23 Beav. 248. *Attorney General* v. *Glasgow College*, 2 Coll. Ch. 665. The precise point we find it necessary now to discuss is whether such evidence can be considered for the purpose of identifying the missionary societies intended by the will.

It may perhaps be conceded that the private religious opinions of the testator would not be competent evidence, but evidence of his public religious acts and association with a particular denomination of Christians, in connection with other testimony, has often been admitted; and we are not prepared to say that there might not be cases in which such evidence, unconnected with other evidence, would be competent. If each denomina-tion of Christians had one missionary society bearing the name of the denomination, and a testator left a bequest to "the Missionary Society," without further description, his publicly

professed religious belief would naturally throw some light upon the meaning. It could not well be presumed that a zealous Roman Catholic could intend by these indefinite words a Protestant missionary society, or that a zealous Trinitarian intended such a gift for a Unitarian society.

There is, however, little or no evidence in this case of the religious opinions of the testator, except as they may be inferred from his acts in connection with churches and religious societies, and the usages of those churches and societies; and it is unnecessary to decide whether his religious opinions, disconnected from the other evidence, would be competent. Some of the evidence reported relates to times which were so long after the execution of the will as to be incompetent.

In carrying into execution every will, extrinsic evidence is necessary to identify the legatees. The evidence often leaves no room for doubt, as the name or description of the legatee in the will accurately conforms to the facts established by the evidence; but when the evidence raises a doubt, the question arises whether, by competent evidence, the identity of the legatee can be ascertained with reasonable certainty.

The facts known to the testator at the time he executed this will, the names by which he was accustomed to call the missionary societies, or by which they were usually called and known in the religious society with which he worshipped, the interest shown by him in any particular missionary society, and the contributions, if any, that he made for missionary purposes, are competent evidence to aid in identifying the missionary societies intended by the will.

The testator was a Rear Admiral in the Navy of the United States, and was retired from active service in 1868, when he went to reside in Winchester, in this Commonwealth, where he had previously bought a house, and with it a pew in the meeting-house in Winchester, in which a Trinitarian Congregational church and society worshipped. In the testimony, the word Congregational is confined to Orthodox or Trinitarian Congregational churches and societies, and, for convenience, we shall use the word in that sense. The testator was not a member of any church until 1878, when he was confirmed in the Protestant Episcopal Church at Charlestown, in this Commonwealth. His

principal place of residence from 1868 until his death seems to have been Winchester, although he was absent something less than a year at Portsmouth, New Hampshire, as Port Admiral, and from 1873 his summers, or some of them, were spent in Nahant, and the winters for the last two years of his life were spent in Boston.  In the spring of 1871, he became a member of the Congregational society at Winchester, by vote of the society.  When in Winchester, he appears to have attended constantly the morning service of the Congregational church, and often the afternoon service, when there was such a service, and frequently the evening meetings and monthly concerts, and the business meetings of the society after he became a member, and he was a member of the Bible Class of the Sunday School. He paid annually his pew-tax of seventy-two dollars a year, and a subscription of fifty dollars, for the support of the church and society.  When in Nahant, he attended the Methodist Episcopal church, the only other church in Nahant being a Union Church, in which ministers of different denominations preached in turn during the summer.  After he was confirmed in the Episcopal church in Charlestown, in 1878, he occasionally attended that church, but otherwise continued, as before, to attend the Congregational church in Winchester.  It appears that Admiral Thatcher, as a boy, was accustomed to attend a Congregational church ; that his father, mother, and sisters were of that faith ; that he was married in 1831, and his wife was a member of that church ; and that, when on shore and at home, he for the next ten years attended with her a Congregational church in Mercer, Maine.  It seems that the religious service in the Navy, which he attended when on duty, was the Episcopal service.  In 1854 and 1855, in Philadelphia, he went to different churches.  In 1859, he was stationed at the Charlestown Navy Yard in Massachusetts, and remained there until January, 1862.  He attended the Episcopal service at the yard, or on shipboard in the morning, and in the afternoon went with his wife, sometimes to the Episcopal church, and sometimes to the Congregational church.  At one time, about 1849, he hired a pew in Grace Church, an Episcopal church in Boston, and he and his wife agreed that they should go half the day to the Episcopal church, and half the day to the Congregational church; but

this pew he gave up not long afterwards, and went to a Congregational church.

In Portland, in 1842, he went to the Congregational church. He was in active service during the war, and in 1866 was ordered to the Pacific coast, to take command of the North Pacific Squadron, with his headquarters at San Francisco, where he remained about two years, and, when on shore in San Francisco, he attended Dr. Stone's church, which was Congregational, and Dr. Eell's church, which was Presbyterian. At Honolulu, in 1866, he did not attend the Episcopal church, but attended either a Congregational or Presbyterian church. At all churches where he attended, he was in the habit of putting something into the contribution-box whenever it was passed, whatever the object of the contribution was, and he habitually contributed in this way to both home and foreign missions in Winchester. There is no evidence that he ever worshipped with a Roman Catholic, a Baptist, or a Unitarian church.

It is apparent that Admiral Thatcher was a constant attendant upon public religious worship; that he confined his attendance to the Protestant Trinitarian churches; that he used in the Navy, as is customary, the Episcopal service; that at times before 1870 he showed a personal preference for the Episcopal Church, but that this preference was not very strong; that he attended the Episcopal, Congregational, Methodist, or Presbyterian churches, without any decided denominational bias, according to his convenience, or his approbation of the minister or the service; and that, as a fact, he more frequently attended the Congregational churches than any other, influenced perhaps, to some extent, by the wishes of his wife.

The interest he is shown to have felt in the missionary work of the American Board, the knowledge of the relations existing between that Board and the Massachusetts Home Missionary Society, which he obtained from Mr. Phillips, the manner in which the two societies were usually spoken of in the church and religious society at Winchester, where he worshipped when he made the will, and the manner in which he spoke of them, have far more significance than the evidence of his attendance at churches.

Of the list of missionary societies contained in the schedule annexed to the answer of the Attorney General, there is no evidence that the existence of the greater part of them was known to the testator when he executed his will, although he probably knew that nearly all the different Christian denominations had missionaries and missionary societies. It appears abundantly by the testimony that in 1870, when the will was executed, he knew of the American Board of Commissioners for Foreign Missions; had been acquainted with some of its officers, agents, and missionaries; and was interested in the work that society was doing; and that he knew of the Massachusetts Home Missionary Society as a coöperating society, devoted wholly to home missions, while the 'American Board was devoted exclusively to foreign missions. It does not appear that he knew definitely the relations existing between the Massachusetts Home Missionary Society and the American Home Missionary Society. He had, when in command of the Constellation in the Mediterranean, some years before he went to reside at Winchester, proceeded with his ship to Syria to witness the execution of a murderer of one of the missionaries of the American Board; and although he did not witness it, yet the circumstance seems to have called his attention to the foreign missionaries of the American Board and the work they were doing, and from that time he manifested in many ways unusual interest in the missions of that board; and in 1869 the American Board began sending him the Missionary Herald, a monthly publication of that society. From 1869, therefore, he was constantly receiving the Missionary Herald. The American Board of Commissioners for Foreign Missions is the principal foreign missionary society of the Congregational Church in the United States. It was one of the principal charities to which the Congregational church and society at Winchester contributed before and in 1870; and by the Foreign Missionary Society, in the Congregational church and society at Winchester, before and in the year 1870, this society was meant. Both before and after executing this will, he is shown to have spoken approvingly of the work of the missionaries of that society in the East. He was interested in the purchase of a vessel called the Morning Star, which was built by the American Board in 1870. If the bequest in the will had

been solely to the Foreign Missionary Society, in view of the knowledge of the testator, at the time of the execution of the will, of the American Board of Commissioners for Foreign Missions, the interest he had shown in it, the acquaintance he had had with some of its officers and missionaries, the favorable opinion he entertained of the work it was doing, the fact that in the church and religious society which he attended it was often spoken of as the Foreign Missionary Society, and was the foreign missionary society for which contributions were annually taken up, to which he contributed, and was one of the great charities which that church and religious society was supporting, and the only one called by that name, — and also of the · fact that it is not shown that he at that time was interested in any other American foreign missionary society, — we can have no doubt that it would be a reasonable and proper inference that the testator intended, by the Foreign Missionary Society, the American Board of Commissioners for Foreign Missions. *American Tract Society* v. *De Witt,* 9 Allen, 447. *Tilton* v. *American Bible Society,* 60 N. H. 377. *Attorney General* v. *Dublin,* 38 N. H. 459. *Goodhue* v. *Clark,* 37 N. H. 525. *Button* v. *American Tract Society,* 23 Vt. 336, 349. *Dunham* v. *Averill,* 45 Conn. 61. *Howard* v. *American Peace Society,* 49 Maine, 288. *Brewster* v. *McCall,* 15 Conn. 274. *In re Fearn's will,* 27 W. R. 392. *In re Kilvert's trusts,* L. R. 7 Ch. 170.

But the bequest is " equally to the Authorized Agents of the Home and Foreign Missionary Societies to aid in propagating the Holy religion of Jesus Christ." The word " societies " plainly shows that more than one society was meant, and that the words " the Home and Foreign Missionary Societies " were not intended as the name of one society. One contention is, that two, and only two, societies were meant, — one the Home Missionary Society, and the other the Foreign Missionary Society. The use of the definite article and of the capital letters by the testator perhaps slightly favors this contention. The facts favor it. If there had been more than one society known to the testator in which he was interested, each of which was a home and foreign missionary society, the contention might well be that he intended this bequest for each of such societies; but no such facts appear. There is a little evidence of an American

missionary society or association "which does work among the slaves at the South, as well as foreign missionary work," to which the church and society at Winchester contributed from 1870 to 1880; but it is not shown that Admiral Thatcher ever spoke of it, or took any interest in it, or ever knew of its existence, unless this is to be inferred from the fact that he attended the meetings when contributions for this society or association were sometimes taken. Whether this society or association is incorporated or not, there is no evidence which enables us to determine, and the evidence regarding this society is too slight and indefinite to affect the determination of this case.

In 1866, Admiral Thatcher spoke to Mr. Phillips "of the good work which the Wesleyan Missionary Society in the Southern Pacific had done," and he was evidently familiar with the fact that the Methodist Episcopal Church had foreign missions, and probably with the fact that that church had home missions. It does not, however, appear that he knew that any of the Protestant Trinitarian churches of the United States carried on their missionary work by means of societies, each of which was both a home and foreign missionary society; and he did understand that the principal missionary work of the Congregational Church was divided between the American Board, which was wholly a foreign missionary society, and the Massachusetts Home Missionary Society, which, with the American Home Missionary Society, to which it was auxiliary, was exclusively a home missionary society.

The following testimony of Mr. Phillips as to the conversation had with Admiral Thatcher, in 1866, is significant of the understanding he had of the connection of the Massachusetts Home Missionary Society with the American Board: "I told him that I understood the purpose of the American Board was limited to foreign work, but that there was another body in Massachusetts which was known as the Home Missionary Society, which was, after all, the domestic branch coöperating with the foreign branch, and the two acting together to uphold the general cause of missions; . . . . that I understood that there were two branches, the home and foreign branches, and we talked always, we spoke .frequently, of the home and foreign branches of the organization; but at the same time he did not understand and did not

state — I did not state and he did not state, and it was not stated to him — that they were exactly branches of the same society, [but] that they were two societies each of which had the good will of the other, and the two coöperated together. . . . . Then I told him that the Home Missionary Society was organized at a somewhat later day, as I understood, to take charge of the domestic work of those who were interested in the missionary movement; but that it was necessarily an independent organization, because the foreign charter did not allow them to take control of it."

We think it is a fair inference from the language of the will, and the facts shown to have been known to the testator when he made it, that he intended to divide the residue of his property equally between home missions and foreign missions; and that he understood that there was a home missionary society, or were home missionary societies, and a foreign missionary society or foreign missionary societies, to whose agents he intended this residue to be paid. As this residue then was to be divided into two equal parts, one to be devoted to home missions and one to foreign missions, and as no intention is expressed that these parts should be subdivided, the natural construction of the testator's words is, that he had in mind two definite societies, one a home missionary society, and the other a foreign missionary society, to whose agents the residue should be paid in equal shares; and the clause is to be construed as if it read, " I also will and desire that the residue of my property be given equally to the Authorized Agents of the Home Missionary Society and the Foreign Missionary Society to aid in propagating the Holy religion of Jesus Christ." If read in this way, we think the evidence makes it reasonably certain what societies were intended. By the Foreign Missionary Society, we think, as we have said, the evidence makes it clear that the testator intended the American Board of Commissioners for Foreign Missions.

Although the evidence does not show that the testator took a special interest in the Massachusetts Home Missionary Society, yet it was the society which, more than any other, represented to him, at the time he made his will, the cause of home missions, the only home missionary society of which he is shown to have had any definite knowledge; and it was a Massachusetts

society, which, in the church and religious society at Winchester, sustained the same relation to home missions as the American Board sustained to foreign missions, and was the society intended in the church and religious society at Winchester when contributions for home missions were solicited; and its name answers better to the description in the will than that of any other society, except perhaps the American Home Missionary Society, to which it is auxiliary. We think that it is reasonably certain that the Massachusetts Home Missionary Society was intended by the words of the testator in the will.

There is no doubt that a bequest to the two societies, "to aid in the propagation of the Holy religion of Jesus Christ," is a good charitable bequest.

The decree entered must be reversed, and there must be a decree that the American Board of Commissioners for Foreign Missions, and the Massachusetts Home Missionary Society, are entitled to receive the residue in equal shares.

*So ordered.*