(3 Misc. Rep. 465.)

TALLMAN v. TALLMAN et al.

(Superior Court of New York City, Equity Term. May, 1893.)

1. WILLS—CONSTRUCTION—TRUST ESTATE.
Testator gave to his wife the use of $50,000 during life, and gave several annuities and legacies, without setting apart any specific property for the purpose. He then appointed certain persons executors and trustees. *Held,* that the will created a trust, so that the court had jurisdiction to construe the will on the filing of a bill for that purpose.

2. SAME—SUSPENDING POWER OF ALIENATION.
Testator gave certain property to his wife for life, with remainder to two grandchildren for life,—one-half to each,— and provided that if either of the latter should have lawful issue his share should become absolute; that if one died without lawful issue his share should go to the other, having such issue; and that if both died without lawful issue the property should go into the residue of the estate. *Held* that, as testator's wife died before he did, the grandchildren took as first life tenants, and there was no room for the contention that the power of alienation was suspended for more than two lives in being.

3. SAME—LEGACY TO WIFE.
Testator gave to his wife, "during her natural life, my homestead farm, on which I now reside; also, my house and lots in the city of New York; * * * also, all my personal property; also, the sum of $50,000." *Held,* that the wife took a life interest, merely, in the personal property and the $50,000.

4. SAME.
The term "personal property," as there used, applied only to personal effects, such as household furniture, bric-a-brac, and the like.

5. SAME—DESCRIPTION OF LEGATEES.
A will named as legatees "The General Bible Society," "Foreign Protestant Missionary Society," and "The Protestant Home Missionary Society," which names, it appeared, were not borne by any societies or organizations. *Held,* that the institutions intended by testator were the "New York Bible Society," "The Board of Foreign Missions of the Presbyterian Church," and the "Board of Home Missions of the Presbyterian Church," which were carried on under the auspices of the denomination to which testator belonged, and to all of which he had been a regular subscriber during his life.

6. SAME—LEGACIES—WHEN CHARGE ON LAND.
Where it appears that the testator supposed that his personalty was sufficient to pay all the legacies provided in his will, a clause bequeathing "all the rest and residue of the real and personal estate" is not sufficient to charge the real estate with any portion of the general legacies.

7. SAME—RIGHTS OF LEGATEES—PRIORITIES.
    Where legacies are to be paid in any event, if the personalty permits, they are entitled to priority in payment over a legacy which is to be set aside by the trustee from any surplus that may be in his possession.

Action by Cornelius H. Tallman, executor, etc., of Jacob B. Tallman, deceased, against John H. Tallman and others, for the construction of a will.

Jacobs Bros., for plaintiff.

Cantor, Linson & Van Schaick, for guardian of Clarence T. and Maria L. Coley.

F. Bien, guardian for Harold Tallman, in person.

B. J. Tinney, guardian for Lester Tallman, in person.

S. G. Clarke, for defendants Margaret Demarest and J. W. Palmer.

Wm. H. Nafis, for defendants John H. Tallman and others.

Parsons, Shepard & Ogden, for Board of Foreign Missions, Board of Home Missions, and New York City Mission and Tract Soc.

Geo. M. Boynton, for New York Bible Soc.

Brownell & Lathrop, for Presbyterian Board of Relief, and for the Trustees of the General Assembly of the Presbyterian Church.

McADAM, J.   The testator made and executed his will at Jamesburg, in the state of New Jersey, October 27, 1887, where he then resided.   He subsequently moved to the city of New York, where he died, July 6, 1892, seised and possessed of a large amount of real and personal property situate in this city and elsewhere. Among these properties are the houses known as Nos. 23 and 25 West Fifty-Third street, called "The Rockland," and Nos. 49, 51, and 53 West Fifty-Seventh street, called "The Soncy." He also owned the homestead farm at Jamesburg, N. J.,—all of which real property is referred to in his will.   He had other real estate in the city of New York, to wit, property on Fifth avenue, and property in the Twenty-Third ward, (St. Jacob street.) He also owned lands in Suffolk and Westchester counties, and some in the state of Florida, and certain lands in New Jersey, not referred to in his will. His personalty consisted of notes, stocks, and railroad securities, bonds, and mortgages, some of the latter affecting property in New Jersey.   Certain household effects, consisting of furniture, bric-a-brac, etc., were in the house in which he resided at the time of his death, to wit, No. 23 West Fifty-Third street, and other household effects on the farm in New Jersey.   This description of his property is deemed sufficient for present purposes.   The will was drawn by the testator himself, is in his own handwriting, and, omitting the formal introductory part, is in these words:

"First. After all my just debts are paid and discharged, I give, devise, and bequeath to my beloved wife, Maria E. Tallman, during her natural life, my homestead farm on which I now reside; also, my house and lots in the city of New York known as Nos. 23 and 25 West Fifty-Third street, also known as 'The Rockland;' and also my house and lots in said city known as Nos. 49, 51, and 53 West Fifty-Seventh street, also known as 'The Soncy;' also, all my personal property; also, the sum of fifty thousand dollars. And

I authorize her, my said wife, to sell and dispose of the same, and to give deed or deeds, as she may decide to do, for her own use and benefit, during her natural life; and after her decease I give, devise, and bequeath the said bequest, or so much as shall remain over, unto my two grandchildren, Clarence T. Coley and Maria L. Coley, children of my adopted daughter, Minnie H. Coley, (now deceased,) each one-half of said estate, for their own use and benefit during their natural lives, and should they, either of them or both of them, get married, and have legal issue, then the said bequest shall be given to them absolute. Should either one of them die without having legal issue, then the one having legal issue shall have the share of the other, or the whole of said bequest as aforesaid to my wife; and, should they both die without legal issue, then the said bequest, as aforesaid, shall be given as hereinafter provided. I also give and bequeath to my mother, Ann Tallman, two hundred and fifty dollars a year during her natural life. I give and bequeath to my sister, Margaret Jane Palmer, two hundred and fifty dollars a year during her natural life. I give and bequeath to the Presbyterian Board of Relief for Disabled Ministers and the Widows and Orphans of Deceased Ministers, for the uses and purposes of said board, five thousand dollars. I give and bequeath to the General Bible Society of New York City. five thousand dollars. To the Protestant City Missionary Society of New York City, two thousand and five hundred dollars. To the Foreign Protestant Missionary Society, five thousand dollars. To the Protestant Home Missionary Society, five thousand dollars. To the Trustees of the General Assembly of the Presbyterian Church in the United States of America, for the use of the Presbyterian Committee of Missions for Freedmen, two thousand and five hundred dollars. To the American Tract Society, two thousand and five hundred dollars. I give and bequeath unto Maggie G. Farr, now living in my family, three thousand dollars. I give and bequeath all the rest and remainder of my estate as follows: To my nieces and nephews, Ella A. Tallman, Emma Hogencamp, Anna M. Perry, Margaret Demarest, Stella Tallman, Charles W. Demarest, Charles E. Tallman, Harold Tallman, Lester Tallman, James W. Palmer, share and share alike. Likewise, I make, constitute, and appoint my said beloved wife, Maria E. Tallman, and Cornelius H. Tallman, to be my executrix and executor and trustees of this, my last will and testament, hereby revoking all former wills by me made. In witness whereof, I have hereunto subscribed my name and affixed my seal this twenty-seventh day of October, in the year of our Lord eighteen hundred and eighty-seven."

It was admitted to probate by the surrogate of New York county July 29, 1892, as a will of real and personal property, and the plaintiff duly qualified as executor. The wife and also the mother of the testator departed this life before his death. The will is entitled to little merit, either as a literary or legal production, and has given rise to several questions as to its legal effect, and the manner in which it must be carried out to satisfy its requirements; and the present bill was filed by the executor for the purpose of obtaining a legal construction of the different provisions thereof, and to that end all persons interested in the subject-matter have been made parties, and are legally represented before the court.

The first question is whether the will creates a trust. Such an intention on the part of the testator is manifest, for he appoints his wife and brother not only executors, but trustees; showing that he had in mind, while making his will, the prevailing idea that he was creating a trust, and supposed when he had executed it that this purpose had been made effectual. Trusts, or at least powers in trust, are sometimes inferred from the terms of a will, when an intention to create the same is necessary to carry out the directions

and purposes of the testator; and where that inference obtains, either from the use of precatory words, necessity, or otherwise, the courts will declare and enforce such trust according to its nature, as a similar trust, declared in express terms, would be enforced. Pom. Eq. Jur. § 1013; Morse v. Morse, 85 N. Y., at page 60; Hill, Trustees, 65, 71, marginal paging; Perry, Trusts, § 112. The testator, among other provisions for his wife, gives to her the use of $50,000 during life. Such a gift is of the interest only, and intends an investment by the trustees that will produce a stated income. Several annuities are given by the will. These are to be paid annually to the beneficiaries, and, as the will does not set apart any specific property for the purpose, these provisions contemplate some investments by the trustees out of which these bequests may be satisfied. Several legacies aggregating $27,500 are given to charitable institutions, and one of $3,000 given to Maggie G. Farr. No fund is set apart for their payment, and no direction given as to when or from what they shall be paid. The duty of attending to these details falls upon the surviving executor, as trustee, and he must, if possible, provide for their payment. No devise to executors is necessary to create a trust estate, nor is it necessary to use the word "trust" or "trustee." But where a trust estate is taken by implication no greater estate would be implied than what is necessary to satisfy the object of the trust. Where it appears to have been the intention of the testator that the income given to one by the will is to be received by the beneficiary through the medium of an executor, a trust is established. Craig v. Craig, 3 Barb. Ch. 76; Leggett v. Perkins, 2 N. Y. 297; Savage v. Burnham, 17 N. Y. 561; Tobias v. Ketchum, 32 N. Y. 319; Vernon v. Vernon, 53 N. Y. 351; Low v. Harmony, 72 N. Y. 408; Morse v. Morse, 85 N. Y. 53; Marx v. McGlynn, 88 N. Y. 357; Robert v. Corning, 89 N. Y. 225; Hathaway v. Hathaway, 37 Hun, 265. It is one of the fixed rules of equitable construction that there is no magic in particular words; and any expressions that show emphatically the intention of the parties to create a trust will have the same effect. Hill, Trustees, 65. Sufficient has been stated to demonstrate that the will creates a valid trust, and that jurisdiction of the court to interpret the will follows, as of course. The jurisdiction is incidental to that over trusts. Chipman v. Montgomery, 63 N. Y. 221, 230; Bailey v. Briggs, 56 N. Y. 407, and cases collated in Hemmje v. Meinen, (Super. N. Y.) 20 N. Y. Supp. 619. The court has jurisdiction to construe wills whenever necessary to guide the action of a trustee. Wager v. Wager, 89 N. Y. 161, and kindred cases. The nature and extent of the trust, and the manner of carrying out the will, are considered in detail further on.

The next question is that concerning the Coley children. The life estate devised to the wife, and bequest to her, lapsed in consequence of her death before that of the testator, and by the terms of the will the same were, after her decease, to go to Clarence T. Coley and Maria L. Coley, children of the testator's adopted daughter, each taking one-half, during life, with a possible fee, the con-

tingency upon which it depends being that should either get married, and have lawful issue, then their title was to become absolute. It is claimed by two of the residuary legatees and heirs at law that the devise as to the real estate is void, as suspending the power of alienation for more than two lives in being; and the argument is that it is not sufficient if, in the event of the death of the testator, it turns out that the estate is alienable within the proper time, but it must be made so by the will, and not the result of chance. Such is, undoubtedly, the language of some of the cases. Nelson, C. J., in Hawley v. James, 16 Wend. 61; Odell v. Youngs, 64 How. Pr. 56. Under the provisions of the will, Mrs. Tallman was to take a life estate, and each of the Coley children a life estate in one-half of the remainder, to be made a fee upon his or her marriage, and birth of issue. In the event of the death of one of these children, the share of the child so dying goes to the survivor, if he or she be married, and have issue. If not, upon the death of the survivor, unmarried and without issue, the property goes to the residuary devisees. Assuming, then, that Mrs. Tallman had survived her husband, there is, it is claimed, no provision for the vesting of the whole estate until after her death and the death of both of the grandchildren. The case might then have been brought within the prohibition of the statute, and the devise would have been void. Hawley v. James and Odell v. Youngs, supra; Dana v. Murray, 122 N. Y. 617, 26 N. E. Rep. 21. But the will speaks as of the time of the testator's death, and whatever might have been the effect, had Maria E. Tallman, his wife, survived him, matters not, as by her death before him the legacies and devises to her lapsed, and are not to be considered in estimating the terms within which alienation is restrained, or the absolute ownership suspended. The death of the testator's wife before his death leaves it as if she had not been named in the will. If the Coley children get anything, they get it as the first life tenants, and the case is thus relieved of all embarrassment. That the will and status of the parties are to be so regarded is evident from the very terms of the statutes themselves. As to personal property, the rule against perpetuities expressly refers to the "death of the testator" as the period when the forbidden or limited terms begin to run, (2 Rev. St. [6th Ed.] p. 1167, § 1,) and, as to real estate, the same principle applies by another section, (section 41,) in the following language:

"The delivery of the grant, where an expectant estate is created by grant, and, where it is created by devise, the death of the testator, shall be deemed the time of the creation of the estate." Id. p. 1104.

The elementary writers and the courts have concurred in adopting the construction contended for by the Coleys, and thus in upholding the plain intention of the statute. This principle has been asserted several times by the general term of this court. In Lang v. Ropke, 5 Sandf. 363, it appeared that the testator, at the time of the execution of his will, had several children who were minors. The scheme of that instrument involved a trust of all his residuary estate in his executors until his youngest child should attain the

age of 21 years.    At the time of testator's death all the children except one had attained their majority.    The court conceded that on the face of the will it appeared that restraint of alienation for an unlawful term had been attempted, but held the defect to be cured by the facts as they existed at the time of testator's death, and that the restraint was therefore but for the term of a single minority, and was valid.    The same will came again before the court in Lang v. Wilbraham, 2 Duer, 171, where the question was again examined, and the doctrine of the prior case reaffirmed.    In Griffen v. Ford, 1 Bosw. 123, the validity of certain provisions in the will of one Jacob Thomas was in dispute.    These provisions suspended the power of alienation in certain real estate during the lives of three of the children of testator.    One of these had died intermediate the execution of the will and the decease of his father. The court said:

"We proceed, then, to the main question,—whether the trust created by the will suspended the power of alienation, as to the property it embraced, beyond the period limited by the statute. And, if we are to look merely at the terms of the will, it cannot be denied that, even upon the plaintiff's construction, the devise in trust was wholly void. By its terms it suspended the power of alienation during the lives of those children whom it named, and, had all these been living when the testator died, there would have been a clear suspension of the power of alienation beyond the statutory period. Two only of the children, however, were then living, and in applying the statutory rule to the provisions of a will it is certain that lives in being at the death of the testator are alone to be considered."

The above language was referred to with approval in Du Bois v. Ray, 7 Bosw. 300.    The decisions in Lang v. Ropke and Griffen v. Ford are indorsed in Chapl. Suspen. 54, in the following language:

"The rule laid down in Lang v. Ropke, and acted on in Griffen v. Ford, is the settled rule in England, and seems to rest on sound reason, for it is in harmony with the general principle that a will speaks as of the date of testator's death. The statute appears, also, to regard only the situation as it exists at testator's death. The 'creation of the estate' takes place at his death, and the 'lives' must be then in being. It is also further to be noticed that the reasons for the statutory strictness regarding the limits of the term do not call for, or warrant, the rule followed in Odell v. Youngs, supra. After an instrument creating a suspension once goes into effect it is essential that its terms must be such as to insure termination of the suspension within the statutory period. In other words, there must be no uncertainty on that point while the term is running. But in the case under consideration all the uncertainty exists during testator's life, and before the term has begun to run; but, as soon as he dies, then comes the moment of judgment for the proposed scheme. It is its validity then that is in question. If at that time it is of such a character that by its terms it may outlast the statutory period, then it is void; otherwise, valid. But during the term there is in any case no uncertainty. There appears to be sufficient warrant for the conclusion that the decision in Griffen v. Ford is sound, and will be followed."

Another distinguished author says:

"As the law should not take a wanton pleasure in thwarting the intention of a testator, it seems strange that it could ever have been supposed that the question of remoteness was to be determined by the state of things at the date of a testator's will, and not at the time of his death. The object of the rule against perpetuities is to confine the vesting of contingent estates to a

short period after their creation; and if it is certain when the estate is created that the contingent event must happen within the required time it seems a needless interference with the testamentary power to say that the estate is bad, because at some time, before the estate was created, and when its existence was entirely in the control of the testator, it was not certain that the contingent event would happen within the required time. For example, land is devised to those children of A. who reach twenty-five. If the testator die before A. the gift is too remote, because A. may have a child born after the testator's death; but if A. die before the testator, there can be no objection to the devise, because it must take effect, if at all, in the lives of A.'s children, and none of these can be born after the testator's death. Mr. Lewis, in the supplement to his treatise, proves superabundantly that the time of the testator's death is the true period at which to judge of the remoteness of the provisions in his will. The rule that the question of remoteness is to be determined from the time of the testator's death, and not of his will, is now settled."

Prof. Gray, in his treatise on "The Rule against·Perpetuities," (section 231:)

"The three cases cited [in Odell v. Youngs] have nothing whatever to do with the matter, and the decision in Odell v. Youngs is certainly wrong." Id., notes.

He also cites a large number of English cases. The rule is stated in similar·language in 1 Jarm. Wills, (5th Ed., by Bigelow,) 254. "In determining the number of term measures, it may be remarked that only those are to be reckoned who are alive when the trust becomes effective. Suppose a testator, at the time of making his will, included a trust, limiting its duration to three lives, one of whom died before himself. Would not the constitution of the trust be valid? A negative answer was given on one occasion, (Odell v. Youngs,) but it is not the law." Bolles, Suspen. § 101. "In deciding whether an executory devise is too remote, the state of things at the testator's death, and not at the date of the will, is to be regarded, according to the weight of authority." 4 Kent, Comm. (12th Ed.) p. 283, note 1. Same doctrine held under the Massachusetts statute. Hosea v. Jacobs, 98 Mass. 65. Mr. Holmes, in his note to Kent, supra, cites the following English cases: Vanderplank v. King, 3 Hare, 1, 17; Faulkner v. Daniels, Id. 199, 216; Williams v. Teale, 6 Hare, 239, 251; Peard v. Kekewich, 15 Beav. 166, 173; Southern v. Wollaston, 16 Beav. 166, 276; Cattlin v. Brown, 11 Hare, 372, 382; Challis v. Doe, 18 Q. B. 231, 247; Monypenny v. Dering, 2 De Gex, M. & G. 145, 169; Ibbetson v. Ibbetson, 10 Sim. 495, 515; Dungannon v. Smith, 12 Clark & F. 546.

The question is not whether the scheme the testator had in mind conforms to the statute, but does the will, at the time of his death, suspend the power of alienation beyond the prescribed limit? The statute is aimed at the operation and effect of the instrument, and if these do not offend the· statute they are not within its prohibition, and consequently unobjectionable. Following the rule of construction adopted in the cases cited, it is clear that the power of alienation was not suspended for more than two lives in being, and as a consequence the devise and bequest to the Coley children

do not offend the statutory provisions in regard thereto. They each take under the will a life estate in the realty, to be made fee upon the happening of the event before referred to. If such event does not occur, then the remainder will vest in the residuary devisees. A construction which makes the will legal is preferred to one which would have an opposite effect. The former respects the testator's intent, the latter defeats it. Another view, worthy of consideration, has been suggested, viz. that which was given to the two Coley children was given to them in severalty, to each one-half, so that it was the same as if the will had read:

"I give my property first to my wife for life, and when she dies I give one-half of the remainder to Maria L. Coley for life, and the other half to Clarence T. Coley for life, and at the death of either the share goes absolutely to his heirs, or to the surviving sister."

This construction finds support in Kelso v. Lorillard, 85 N. Y. 177, and while it is unnecessary, at present, to consider this question in the form presented, after what has been decided in favor of the rights of the Coley children to take and enjoy the devise made for their benefit, the proposition is referred to rather to show that it has neither been overlooked nor ignored than for any purpose deemed necessary.

Again, where life estates were given to two, and the survivor of them, remainder over to a third person, held, that as to the estate of the survivor of the first two ($\frac{1}{2}$) the limitation was valid; as to the other, void. Purdy v. Hayt, 92 N. Y. 446. See, also, Wells v. Wells, 88 N. Y. 323; Schermerhorn v. Cotting, 131 N. Y. 48, 29 N. E. Rep. 980; In re Verplanck, 91 N. Y. 439; Tiers v. Tiers, 98 N. Y. 568; Vanderpoel v. Loew, 112 N. Y. 167, 19 N. E. Rep. 481; Monarque v. Monarque, 80 N. Y. 321.

The bequests of "all my personal property; also, the sum of fifty thousand dollars,"—have reference to the limitation which precedes, of a life interest therein, meaning the use of the former, and the income of the latter. The term, "all my personal property," did not mean all the words, in common acceptation, imply, but had reference only to his personal effects, such as household furniture, bric-a-brac, and the like, of which he died possessed. The intention of the testator, when ascertained, is to prevail over the literal sense of words used. The rule that words of known import must receive their legal effect yields when, from the use of other, inconsistent terms in the will, it is clear the testator did not mean what the words literally imply, or where some obvious incongruity would result from giving them literal effect. Dayt. Sur. (3d Ed.) 405, 406. The construction of the will is to be put upon the entire instrument, and not upon disjointed parts of it; and consequently all its parts are to be construed with reference to each other, that all may harmonize and receive conjoint effect. Id. In other words, the intention of the testator must be gathered from the general, leading intent, as manifested in the whole instrument, that effect may be given to all its parts. General expressions in a will may be restrained by what precedes and follows, and must be so restricted

whenever it is necessary to carry into effect the general scheme of the will. Courts are so solicitous to effectuate the real intention of the testator that they bring different clauses in to aid each other, enlarge the sense of some words, and restrain that of others, in order, if possible, to give a uniform and proper construction to the whole will as one complete instrument. Lippett v. Hopkins, 1 Gall. 454. Rutherford (2 Inst. 414) defines "interpretation" as consisting in finding out or collecting the intention of a writer, either from his words, or from other conjectures, or from both; and he divides it into three sorts: Literal, which is where we collect the intention from the words used only; rational, where the words do not express his intention perfectly, but either exceed or fall short of it, so that we are going to collect it from probable or rational conjectures only; and mixed, where the words, although they do express his intention when they are rightly understood, yet are in themselves of doubtful meaning, and we are forced to have recourse to conjectures to find out in what sense they are used. This doctrine seems to use "rational interpretation" in substantially the same sense as the "construction" of Dr. Lieber's definition. The court in its work of construction must reason from the aim or object of the instrument, its general scope and purpose, and from this standpoint gather from the language used the testator's intention, and, when this is ascertained, must give to it form, life, energy, and effect.

In determining whether words used should be taken in a comprehensive or restricted sense, the court has endeavored to give to the will, and to all its parts, a rational and just construction, in furtherance of the testator's manifest desire. The instrument being a "holograph" will, drawn by a lay hand, the testator has blended words as an unskilled workman might have mingled paints. The law aids the untutored hand, and harmonizes the former as an artist would the latter,—consistently, methodically,—giving each character its proper shade and effect, with the prominent features standing out in bold relief, with the details arranged in proper color and place, in consonance with the true design of the author, that all the beneficiaries may receive the worldly recognition the testator meant to accord them when he departed to his final home. The term "homestead farm on which I now reside" had reference to the dwelling house and grounds at Jamesburg, where he resided at the time the will was made. In the legacies to the charitable institutions the testator failed to describe them by their correct corporate titles, but the evidence has made it so clear as to the institutions he had in view that there is hardly room to question his intention, nor is there any doubt as to their right to receive the legacies. A misnomer in a will in designating the society or organization intended to be benefited by a legacy will not defeat the bequest, if it can be reasonably shown what society in fact was contemplated by the testator. Gilmer v. Stone, 120 U. S. 586, 7 Sup. Ct. Rep. 689, and cases cited; Lefevre v. Lefevre, 59 N. Y. 440; Bradley v. Rees, 113 Ill. 332; Decker v. Decker, 121 Ill. 341, 12 N. E. Rep. 750; 1

Jarm. Wills, (Rand. & T. Ed.) 411, note, 760, note; Theob. Wills, (3d Ed.) 277, and cases cited; Story, Eq. Jur. §§ 1169, 1170; 2 Perry, Trusts, § 730; Button v. Society, 23 Vt. 336; McAllister v. McAllister, 46 Vt. 272; Howard v. Society, 49 Me. 288; Trustees v. Peaslee, 15 N. H. 317; Newell's Appeal, 24 Pa. St. 197; Domestic & Foreign Missionary Soc.'s Appeal, 30 Pa. St. 425; Maunds v. McPhail, 10 Leigh, 199; Whitef. Char. 49; Boyle, Char. 130; Brewster v. McCall, 15 Conn. 274; McBride v. Elmer's Ex'rs, 6 N. J. Eq. 107; De Camp v. Dobbins, 29 N. J. Eq. 36; Goodell v. Association, Id. 32; Lanning v. Sisters of St. Francis, 35 N. J. Eq. 392; Banks v. Phelan, 4 Barb. 89.  To the same effect, and that parol evidence may be introduced to explain or remove the latent ambiguity:  Gilmer v. Stone, 120 U. S. 590, 7 Sup. Ct. Rep. 689; Lefevre v. Lefevre, 59 N. Y. 440; Patch v. White, 117 U. S. 210, 6 Sup. Ct. Rep. 617, 710; Maunds v. McPhail, 10 Leigh, 199; Newell's Appeal, 24 Pa. St. 197; Thomas v. Stevens, 4 Johns. Ch. 607; Hart v. Marks, 4 Bradf. Sur. 161; Wood v. White, 32 Me. 340; Meadows v. Barry, 1 Ga. Dec. 80; Knight v. Bunn, 8 Ired. Eq. 82; Whitef. Char. 49, and cases cited; Boyle, Char. 130; McBride v. Elmer's Ex'rs, 6 N. J. Eq. 107; De Camp v. Dobbins, 29 N. J. Eq. 36; Goodell v. Association, Id. 32; Lanning v. Sisters of St. Francis, 35 N. J. Eq. 392; Wig. Wills, pp. 128, 129, 174; Baylis v. Attorney General, 2 Atk. 239; Abbot v. Massie, 3 Ves. 148; Duke of Dorset v. Hawarden, 3 Curt. 80; Doe v. Hubbard, 15 Adol. & E. (N. S.) 248, per Campbell; Newbolt v. Pryce, 14 Sim. 354; Lee v. Pain, 4 Hare, 251; Doe v. Chichester, 4 Dow, 65, 93; Greenl. Ev. § 290; Tilton v. Society, 60 N. H. 377, 382; Hinckley v. Thatcher, 139 Mass. 477, 1 N. E. Rep. 840.  A devise to one by the name he is generally known or named or called by the testator is valid, and extrinsic evidence may be offered to show the fact.  Minot v. Boston Asylum, 7 Metc. (Mass.) 416; Parish v. Cole, 3 Pick. 232; Parsons v. Parsons, 1 Ves. Jr. 266; Abbot v. Massie, 3 Ves. 148; In re Mayor, etc., 10 Coke, 123; Powell v. Biddle, 2 Dall. 70; Foster v. Walter, Cro. Eliz. 106.  A devise to a corporation need not state its corporate name.  It is sufficient that the devisee or legatee is so defined as to be distinguished from any other.  Institution v. How's Ex'rs, 10 N. Y. 88; Counden v. Clerke, Hob. 29a; De Ayray's Case, 11 Coke, 20b; College v. Sutton, 12 Sim. 521; Taylor v. Tolen, 38 N. J. Eq. 91; St. Luke's Home v. Association, 52 N. Y. 191; Holmes v. Mead, Id. 332; Domestic & Foreign Missionary Soc.'s Appeal, 30 Pa. St. 425; Lefevre v. Lefevre, 59 N. Y. 434; Straw v. Conference, 67 Me. 493; Minot v. Asylum, 7 Metc. (Mass.) 416; Howard v. Society, 49 Me. 288; Hinckley v. Thatcher, 139 Mass. 477, 1 N. E. Rep. 840; Parish v. Cole, 3 Pick, 232; 1 Jameson, Wills, 378; Angell & A. Corp. 99, 100; Evidence Dehors the Will, 1 Redf. Wills, p. 587, § 40; Patch v. White, 117 U. S. 210, 6 Sup. Ct. Rep. 617, 710; Jarm. Wills, (Rand. & T. Ed.) 411, notes; Rop. Leg. (4th Ed.) 297; Williams, Ex'rs, 736.  Declarations of the testator, at time of making will, as to his beneficiaries, are admissible.  Tucker v. Society, 7 Metc. (Mass.) 209; Wig. Wills, Prop. § 187; Thomas v. Thomas, 6 Term R. 671; In re Kilvert's

Trusts, L. R. 7 Ch. App. 170; Trustees v. Peaslee, 15 N. H. 330; Hodgson v. Hodgson, 2 Vern. 593; Harris v. Bishop of Lincoln, 2 P. Wms. 135; Duke v. Duchess, Id. 215; Whitaker v. Tatham, 7 Bing. 628.

The rule which will govern the disposition of this case is perhaps best stated by Judge Allen in Lefevre v. Lefevre, 59 N. Y. 440, in the following language:

"A misnomer or misdescription of a legatee or devisee, whether a natural person or a corporation, will not invalidate the provision, nor defeat the intention of a testator, if, either from the will itself, or evidence dehors the will, the object of the testator's bounty can be ascertained. No principle is better settled than that parol evidence is admissible to remove latent ambiguities; and where there is no person or corporation in existence, precisely answering to the name or description in the will, parol evidence may be given to ascertain who was intended by the testator. A corporation may be designated by its corporate name, or by the name by which it is usually and popularly called and known, by a name by which it was known and called by the testator, or by any name or description by which it can be distinguished from every other corporation; and when any but the corporate name is used the circumstance to enable the court to apply the name or description to a particular corporation, and identify it as the body intended, and to distinguish it from all others, and bring it within the terms of the will, may in all cases be proved by parol."

The evidence here clearly demonstrates that the claimants (defendants) were the institutions that the testator meant as recipients of his bounty. The testimony discloses that the deceased, Jacob B. Tallman, was a regular attendant of the Presbyterian church. When he made his home in New York city he attended Dr. John Hall's church, where he had a pew, or Dr. Thompson's church, (both Presbyterian.) When at Jamesburg, he attended the Presbyterian church there. He was a member of the Jamesburg church for 16 years prior to his death, and for some of that time held the office of elder. Dr. Everett, the pastor of the Jamesburg church, who was the testator's friend of 20 years, and pastor of 16 years' standing, testified that Mr. Tallman was a regular attendant at the church services, and a constant contributor to the work of the church, and to Presbyterian charities generally. He contributed very regularly to the Board of Home Missions and the Board of Foreign Missions. He knew of, and conversed about, all three of these societies. Dr. Everett and he had talked about all of them many times, and he was interested particularly in the missionary work of the organizations formed for that purpose in the Presbyterian Church. For the last sixteen years "since he became a Presbyterian," Dr. Everett had never known him to be interested in the charitable work of any other denomination. He never mentioned any missionary bodies other than those connected with the Presbyterian Church. He was not always exact in the names by which he designated these societies, and in his lifetime, as by his will, he would refer to them as the "Home Missionary Society," or "Foreign Missionary Society." Mr. Eaton, who has been connected with the Board of Home Missions for 27 years past, testified that he is very familiar with the general field of mission work, as carried on in and from this city, and asserts positively that he knew of no society by

the name of "Protestant Home Missionary Society." His society does all the domestic mission work that is done in connection with the Presbyterian Church. The board has at various times during its existence received bequests under various designations, such as "Board of Domestic Missions," "Home Missionary Society," "Presbyterian Board of Home Missions," etc. Mr. Dulles, the treasurer of the Board of Foreign Missions, testified to the same effect in regard to that society. Mr. Parsons, a member of the executive board of the New York City Mission and Tract Society, gave similar evidence in its behalf. His testimony is also, in many respects, applicable to the other two defendants. He testified, as did Messrs. Dulles and Eaton, that he never heard of any societies bearing the names used in the will, and, in answer to the court, he said that the names of these three defendants came nearer to the names used in the will than any others he had ever heard. The next of kin offered no evidence in opposition to, or contradiction of, this testimony. By their cross-examination they endeavored, without much success, to show that there were, in the United States, societies, some of which had titles containing some of the words used by the testator in describing these defendants. Even if they had succeeded in this, it would not have helped them. It was incumbent upon them to show positively that there was in existence some other society or societies, which, to use the most happy and appropriate expression of the court in one of the cases cited, came "as near to" the names used by the testator as the names of the defendants. The rule, which governs the aspect of the question now under consideration was stated by Chancellor Walworth as follows, (Smith v. Smith, 4 Paige, 272:)

"A mere misdescription of the legatee does not make the legacy void, unless it is impossible to ascertain, either from the will itself, or from proof dehors the will, who was intended as the object of the testator's bounty."

This rule is quoted with approval in Redf. Wills, (3d Ed.) 436.

In St. Luke's Home v. Association for Indigent Females, etc., 52 N. Y. 193, the court of appeals said:

"A bequest would not be held void for uncertainty as to the legatee, except when it was found impossible, either from the words used alone, or in connection with such extrinsic evidence as would be competent, to determine with reasonable certainty the person or corporation intended."

In the reported cases on this subject it will be found that there has frequently been greater dissimilarity between the designation in the will and the true name of the claimant than appear in this case, and yet the claim has been sustained. In Lefevre v. Lefevre, supra, the American Female Guardian Society was allowed a bequest to "The Home of the Friendless in New York." In Institution v. How's Ex'rs, 10 N. Y. 84, the New York Institute for the Blind was allowed a bequest to "The Trustee of the Institution for the Instruction and Maintenance of the Indigent Blind in the City of New York." In Leonard v. Davenport, 58 How. Pr. 384, the Board of Home Missions, etc.,—one of the defendants here,—was allowed a bequest to the "Home Missionary Society." In Greer v. Belknap,

63 How. Pr. 393, the Society for the Relief of Orphans and Destitute Children in the City of Albany was allowed a bequest to "The Albany Orphan House Asylum." In Shipman v. Rollins, 98 N. Y. 311, the New York City Mission and Tract Society—one of the defendants here—was allowed a bequest to "The New York Tract Society." In Kimball v. Chappel, (Sup.) 18 N. Y. Supp. 30, the Trustees of the Presbyterian Society in the Town of Canton were allowed a bequest to "The Trustees of the First Presbyterian Church in the Village of Canton." See, also, Canfield v. Crandall, 4 Dem. Sur. 111; Riley v. Diggs, 2 Dem. Sur. 187.

There are several facts in evidence which, independent of the foregoing general considerations, are quite decisive of the question under consideration: (a) The testator was a subscriber to these defendants in his lifetime. There is no evidence that he ever subscribed to any other society. In fact, the evidence is to the contrary. In Re Briscoe's Trusts, 20 Wkly. Rep. 355, cited with approval in 52 N. Y. 198, a similar fact in a controversy between rival claimants to a legacy was held to be controlling. See, also, Hornbeck's Ex'r v. American Bible Soc., 2 Sandf. Ch. 133. (b) The testator was a Presbyterian. All these defendants are societies controlled or dominated by Presbyterian influences. While the question of the denominational preference of the testator may not be controlling, yet, in cases where there has been doubt as to the legatee really intended, the fact that a claimant is of the same church as decedent has been given great weight in arriving at the true intent. In Board of Missions v. Scovell, 3 Dem. Sur. 516, the bequest was of one-half of the residuary estate, to be divided between "The Home and Foreign Missions." There, as here, the next of kin claimed that the legacy was void for uncertainty. The legacies were claimed there, as here, by the Board of Home Missions and the Board of Foreign Missions of the Presbyterian Church. The evidence there, as here, showed that the decedent was a member of the Presbyterian Church. The claimant societies were permitted to receive the legacy. So in Hornbeck's Ex'r v. American Bible Soc., 2 Sandf. Ch. 138, the fact that the testator "had previously manifested her feeling of special regard for the institution of the Synod of the Dutch Church" led the court to conclude that a legacy to a charitable society, inaccurately described, was properly claimed by the charitable society connected with the Dutch Church. In the decision of cases of this character it is well to keep in mind that "the general rule is that one may do with his property as he pleases. He may dispose of it by will in any manner that may suit his fancy or judgment. He may give it all to strangers, and thus disinherit his relatives. He may give it all to natural persons, or to corporations capable of taking. It is not against public policy to allow gifts to charitable, benevolent, scientific, or educational institutions. The law allows and encourages such gifts, and those who make them are commended as benefactors of their race." Earl, J., in Hollis v. Seminary, 95 N. Y. 172. The evidence shows that the testator clearly intended that the corporations found by

the court to be beneficiaries should receive the bequests in question. It is immaterial whether there are two or two hundred societies of similar names. The question in either case is the same, —whether the claimant is sufficiently identified as the one intended. The question, such as it is, arises between the charities, on the one hand, and the next of kin of the decedent, on the other, or, as the court of appeals have put it in a similar case, (Booth v. Church, 126 N. Y. 243, 28 N. E. Rep. 238,) between "the cause of humanity" and the "flock of collaterals." Some of these observations are especially applicable to the Board of Home Missions, the Board of Foreign Missions, and the City Mission and Tract Society, but, in general terms apply to the other charitable institutions, in respect to which the identity of the beneficiary intended was as completely established. The court, therefore, finds that the following are the correct corporate designations of the institutions referred to by the testator in his will, and as such intended to be designated and beneficiaries therein: "New York Bible Society," miscalled in the will, "The General Bible Society;" "The Board of Foreign Missions of the Presbyterian Church of the United States of America," miscalled in the will, "Foreign Protestant Missionary Society;" "Board of Home Missions of the Presbyterian Church in the United States of America," miscalled in the will, "Protestant Home Missionary Society;" "The New York City Mission and Tract Society," miscalled in the will, "Protestant City Missionary Society of New York City." Three of the other societies, viz.: (1) "Presbyterian Board of Relief for Disabled Ministers and for the Widows and Orphans of Deceased Ministers;" (2) "The Trustees of the General Assembly of the Presbyterian Church in the United States of America for the Use of the Presbyterian Missions for Freedmen;" and (3) "The American Tract Society,"—are correctly described.

The next question is as to the time and manner of payment of the legacies given by the will. The settled rule in regard thereto is that legacies are not a charge upon real estate, unless such an intention is expressed or can be shown from the will itself, corroborated by extraneous circumstances. The mere fact that legacies are given, which the personalty is inadequate to pay, is not sufficient proof of such intention, when such inadequacy was not presumably known to the testator, but was only revealed after his death. Bevan v. Cooper, 72 N. Y. 317, and Larkin v. Larkin, (R. I.) 23 Atl. Rep. 19. The testator, according to the inventory filed with the surrogate, left a personal estate of the nominal value of $546,000.14, and of the present estimated value of $15,077.80, while his equity in the real property is estimated at about $372,000. It also appears from the inventory and testimony that the deceased held four bonds and mortgages on real property in New Jersey of the face value of $50,100, which are placed at nominal value because of litigation regarding them, but which may prove productive, the same being in process of foreclosure. These, as well as other effects, may, when sold or collected, augment the personalty con-

siderably. This condition of things bears upon the question whether the legacies should be charged upon the residuary estate; for, after all, the intention of the testator to make such a charge upon any or all of his realty is the controlling feature, (McCorn v. McCorn, 100 N. Y., at page 513, 3 N. E. Rep. 480,) and the language of the will is the basis of inquiry, aided by extrinsic circumstances, prominent among which is the absence of sufficient personal property, and the relationship of the beneficiaries to the testator, (Scott v. Stebbins, 91 N. Y. 605.) While this rule is not generally extended to defeat specific devises,—for these segregate from the estate certain property,—it is more aptly applied to the residuary clause, where personalty and realty are blended together, and go to wind up the testator's estate. See Ragan v. Allen, 7 Hun, 537; Forster v. Civill, 20 Hun, 282. Willard, in his work on Equity Jurisprudence, (Potter's Ed.) at page 489, says:

"If the testator gives a legacy, without specifying who shall pay it, or out of what fund it shall be paid, the legal presumption is that he intended it should be paid out of his personal estate only, and if that is not sufficient the legacy fails."

Courts have sometimes held that slight circumstances were sufficient to charge the realty, but the consensus of opinion is that the charge can be made only where the intention clearly appears. If the residuary clause had contained the words, "after the payment of debts and legacies," the intention of the testator would have been apparent; but, unaided and alone, the usual clause devising and bequeathing "all the rest and residue of the real and personal estate" is not sufficient to show an intention to charge the real estate with any part of the general legacies. Brill v. Wright, 112 N. Y. 129, 19 N. E. Rep. 628; Wiltsie v. Shaw, 100 N. Y. 191, 3 N. E. Rep. 331; McCorn v. McCorn, 100 N. Y. 511, 3 N. E. Rep. 480; Morris v. Sickly, 133 N. Y. 456, 31 N. E. Rep. 332. The testator evidently thought he had ample personalty to pay the legacies, all of which are general, not special or demonstrative, and may have purposely refrained from charging any part of the real estate with their payment, and this is believed to have been his object. At all events, this is the legal inference to be drawn from the will, and there is nothing in the case to overthrow the presumption. The bequest to the wife of the use of $50,000 during her life indicates that he deemed his personal estate ample to set apart that sum, and pay the legacies as well.

This, in effect, disposes of the question of construction, and, if there was personalty enough, there would be no difficulty in administering the estate on these lines; but the personalty is apparently insufficient, at present, to discharge the debts against the estate, and the legacies required by the will to be paid. No provision is made in the will for raising money for debts or legacies, and the executor would, no doubt, like to be instructed where he is to get the $50,000 to invest for the Coley children, and the money required to purchase an annuity for the testator's sister, Margaret Jane Palmer, that will yield her, while she lives, $250 a year.

The mother of the testator having departed this life before his death, the provision as to the annuity to her becomes nugatory. The executor must dispose of all the personalty not specifically devised, turn it into cash, and out of the proceeds first pay the debts, (Rop. Leg. 876,) and out of any surplus purchase an annuity for the testator's sister that will yield her $250 per annum. He should next pay the general legacies to the charitable institutions, and to Maggie G. Farr, and, if the moneys in his hands be insufficient for that purpose, he should pay the same pro rata, and continue such payments until they are fully discharged. 13 Amer. & Eng. Enc. Law, 68; McCorn v. McCorn, 100 N. Y. 511, 3 N. E. Rep. 480; McClel. Sur. Ct. Pr. 276. He should next invest $50,000 for the benefit of the Coley children, and pay them, half-yearly, the interest realized thereon. The $50,000 is placed behind the legacies because these were to be paid in any event, if the personalty permitted, while the $50,000 was intended to be set aside by the trustee from any surplus that might be in his possession. The executor may come into the possession of more funds, but if he does not receive sufficient for the purposes aforesaid the estate in respect thereto is likened to a devise or bequest upon which there is nothing to operate, and as a consequence can have no effect. Another suggestion by way of instruction to the executor becomes necessary: He should remember that the personal estate is deemed the natural and primary fund for the payment of debts, and that if, by peradventure, it should prove insufficient, the land not specifically devised becomes first applicable to their payment; and the executor must take care to discharge all the debts before satisfying any of the legacies. Williams, Ex'rs, (Ed. 1832,) p. 380.

In conclusion, it may not be improper to state that the court has given to the matter the patient consideration its importance deserves; and while regretting the vague and general language of the will, its inartistic form, and general makeup, and condemning the practice of laymen attempting to make testamentary dispositions of large properties without the aid of a skillful practitioner, it has taken pains to give effect, as far as possible, to the intention of the testator; and, if the construction given does not aid in carrying out all its provisions, it gives effect to those capable of being enforced, and the misfortune in not aiding the others is because the pecuniary condition of the testator's personal estate has fallen below his anticipations, and he has in consequence unintentionally given away perhaps more in charity than his personal property warranted; an error of judgment not censurable, but characteristic, perhaps, of the man,—that he was willing to befriend and help others, even beyond his means. The findings submitted by the different parties have been settled, and the decree in accordance herewith must be settled on notice.