(43 Misc. Rep. 280.)

COLEY et al. v. TALLMAN et al.

(Supreme Court, Special Term, New York County. March, 1904.)

1. GUARDIAN—FRAUD—FORECLOSURE OF WARD'S LAND—SETTING ASIDE.

In an action to set aside as fraudulent a conveyance in foreclosure, it appeared that plaintiffs were entitled under a specific devise to a fee and to a life interest in two apartment houses owned by the testator; that testator's executor was the principal creditor of the estate, and the guardian of plaintiffs; that under a scheme entered into between himself, his attorney, and his daughter while he was guardian of the plaintiffs, who were then infants, he permitted taxes and interest on a mortgage existing on one of the apartment houses to remain unpaid; that the mortgage was thereupon foreclosed, and bought in in his daughter's name for about 60 per cent. of its value; that he led plaintiffs to believe that he was buying it in for their benefit; that because of such act the devisees received nothing out of such apartment house, while the guardian and his attorney received the surplus money as creditors. Defendants alleged that no injury was done to plaintiffs, because that the apartment house must have been sold to pay the debts of the testator. It appeared that, in an action brought before foreclosure by the daughter of the guardian to partition real estate not specially devised and to sell the realty to pay the debts, a sale was directed and a creditor's proceeding brought before the foreclosure to sell the real estate specially devised for unpaid debts; that under such proceeding the other apartment house was sold; that the general guardian and his attorney established claims against the estate by illegal evidence, so as to make resort to the property specially devised inevitable; and that because of these transactions the devisees received nothing on their specific devises, while their guardian and his attorney were paid most of the proceeds of the sales. *Held*, that the foreclosure conveyance would be set aside.

Action by Clarence T. Coley and others against Cornelius Tallman and others to set aside a conveyance as fraudulent. Judgment for plaintiffs.

Eugene Lamb Richards, for plaintiffs.

Jay & Candler, for defendants Tallman and Bethel.

David B. Ogden, for defendants White.

Frank M. Tichenor, for defendant Cutter.

DAVIS, J. This action is brought to set aside as fraudulent and void a conveyance in foreclosure of premises Nos. 49, 51, and 53 West Fifty-Seventh street, New York City, known as "The Soncy," made to the defendant Stella Bethel, or to have her declared a trustee of said premises for the benefit of the plaintiffs, and for other relief. In the course of the trial the plaintiffs consented to the dismissal of the complaint against the defendants Raymond S. White, Sadie C. White, and Gertrude A. Cutter, and judgment was entered accordingly.

At the trial it appeared that, on July 6, 1892, Jacob B. Tallman died seised of valuable real estate in New York and elsewhere. By the terms of his will, which was probated July 29, 1892, he gave the "rest and remainder" of his estate to his nieces and nephews, one of whom is the defendant Stella Bethel. But toward the plaintiffs, who were children of his adopted daughter, he apparently acted more generously, for he gave to them, among other things, a specific devise of a life interest in the premises Nos. 23 and 25 West Fifty-Third street, known as "The Rockland," and in Nos. 49, 51, and 53 West Fifty-Seventh

street, known as "the Soncy," in New York City, "each taking one-half during life, with a possible fee, the contingency upon which it depends being that should either get married and have lawful issue, then their title was to become absolute." Such was the construction placed upon the will in the case of Tallman v. Tallman, 3 Misc. Rep. 465, 471, 23 N. Y. Supp., 734. Thereafter letters testamentary were issued to the defendant Cornelius H. Tallman, who is a brother of the testator, and father of defendant Stella Bethel. He has been acting as executor ever since. The plaintiffs were infants at the time of the death of the testator, one being about 13 years of age and the other 15; and on June 13, 1893, the defendant Cornelius H. Tallman was appointed their general guardian under an order of the Superior Court, and as such had possession and control of the Soncy and the Rockland. From this time on, except while away at school, the plaintiffs lived more or less in the household of their general guardian, and received from him $10 a week out of the rents of the Soncy. In October, 1900, the plaintiff Maria Coley Brown married Herbert C. Brown, by whom she has two children, both now living, the events upon the happening of which she was to take the fee in one-half of the Soncy and the Rockland. The Soncy, with which we are specially concerned in this action, was a large apartment house in West Fifty-Seventh street, and, according to the estimate of the defendant Cornelius H. Tallman, was worth $300,000 in February, 1900, and was subject to a first mortgage of $150,000, held by the Bowery Savings Bank. According to the plaintiffs' expert it was worth not less than $265,000. The yearly rental varied from $19,000 to $22,000 a year, and after paying all expenses of carrying the property there would be a surplus of about $1,500 each year. Such was substantially the value and status of the Soncy when the defendant Cornelius H. Tallman took charge of it, together with the Rockland, as the general guardian of the plaintiffs. The plaintiff Clarence Coley became of age December 1, 1898; however, for a long time thereafter Tallman still continued in charge of the Soncy and collected its rents.

The plaintiffs claim that Tallman stood in a fiduciary relation to them in respect to the Soncy, and therefore was bound to watch over and care for their interest in this property, to the exclusion of any advantage personal to himself; that he was false to his trust; that he took advantage of his fiduciary relation to them and to their estate, and fraudulently allowed the mortgage on the Soncy to be foreclosed, for the purpose of getting the property into his own hands. They claim that he purposely allowed the taxes and interest on the mortgage to remain unpaid, in order to bring about a foreclosure of the $150,000 mortgage and a sale of the premises to himself or to his daughter, Stella Bethel, in his interest, and that in this scheme he was aided and abetted by his daughter, Stella Bethel, and Michael Jacobs, his attorney, and that the defendant Poucher was used by them as an instrument to aid them in the proceedings. The foreclosure proceedings were begun November 26, 1898. Neither of the plaintiffs herein had reached the age of 21 at that time. On March 24, 1899, a guardian ad litem was appointed for Maria Coley. On January 10, 1899, not quite a month and a half after becoming of age, at the invitation of Tallman, Clarence

Coley went to Jacobs' office, where he was persuaded by Tallman to execute a release of Tallman as general guardian. No account was given to him, and no money was paid to him, and he claims that he did not know the real character of the paper he signed. I am convinced from the evidence that Coley was ignorant of the contents of the paper then signed by him, that he was induced to sign it by the misrepresentations of Tallman, and for this reason it should be set aside. Jacobs had already appeared for Tallman and Stella Bethel in the foreclosure proceedings, and on January 19, 1899, he gave jurisdiction over Clarence T. Coley by appearing for him also. No answer was interposed on behalf of Coley. The foreclosure suit being now in progress, Tallman, aided by Jacobs, his attorney, began to make financial preparations to become the purchaser. He first enters into an agreement with Raymond S. White for a loan of $175,000, to be secured by a first mortgage to be placed upon the Soncy, Tallman agreeing to permit the foreclosure of the mortgage of $150,000 then upon the premises, and procure and deliver to White a mortgage upon the Soncy, signed by the purchaser at the foreclosure sale. At the request of Tallman, White agreed to keep the $175,000 free and available for this loan for three months from March 1, 1899, Tallman agreeing in return to give his personal bond to pay White interest at the rate of 3 per cent. on the $175,000 from that date monthly in advance, until the bond and mortgage were delivered or the contract rescinded. The foreclosure sale not having taken place by June 1, 1899, a supplemental agreement was made between White and Tallman, whereby White agreed to deposit the $175,000 in a trust company, and Tallman agreed to pay the difference in interest between 5 per cent. and 2 per cent. until October 1, 1899. Under this arrangement interest amounting to $4,623.09 was paid by Tallman to White out of the rents of the Soncy. Tallman and Jacobs next proceed to get the deposit money necessary to be paid down at the sale. This money, $19,000, was furnished to Tallman also by White, who was secured by a bond executed by Tallman and the Union Surety & Guaranty Company. The terms of this bond express the fact that this $19,000 was to be advanced to Tallman on account of the purchase price of the Soncy in case it should be bought by Tallman or Jacobs, or by any one in their behalf. The evidence shows that it was bought in Tallman's behalf, and title taken for him in the name of his daughter, Stella Bethel. The terms of sale are then arranged to meet the convenience of Tallman by the insertion of a provision that not more than $19,000 deposit should be required from any bidder. The referee put in this provision at the request of Jacobs. The property was then bid in by Jacobs for $183,000 on January 31, 1900, and Poucher was named as the purchaser. Poucher had long been in the employ of Tallman as bookkeeper, and both Jacobs and Tallman had asked him to allow his name to be used as purchaser. Poucher immediately signed an assignment of his bid in blank. Before the title was passed, however, the name of defendant Stella Bethel was inserted as assignee in this assignment. Mrs. Bethel testified that she was the real purchaser, but her manner on the stand indicated that her statement on this point was formal rather than truthful, and I am convinced from the evidence that she was merely a

dummy in the transaction, knowingly aiding her father to hide the fact of his being the purchaser of the Soncy. Tallman next proceeds to provide for the raising of $25,000, to be secured by a second mortgage on the Soncy. He obtained this money from defendant Gertrude Cutter. On February 21, 1900, the defendant Bethel appears at the office of Jacobs, takes title, and executes the bonds and mortgages, one for $175,000 to White, and the other for $25,000 to Cutter. Each of these loans is guarantied by her father, Cornelius H. Tallman, by his individual bond to Cutter and White, and the bond to Cutter was further guarantied by the surety company, at the request of Tallman. This appears from Tallman's application to the surety company. White and Cutter pay over $200,000, represented by the two mortgages, but none of it goes to Mrs. Bethel. As soon as these bonds and mortgages were made by Stella Bethel, she executed and acknowledged a deed of the premises, with the grantee's name omitted, and in the presence of her father, Cornelius H. Tallman, gave it to Jacobs, who in this proceeding was attorney for Stella Bethel, Tallman, and Clarence Coley. This blank deed was returned to Mrs. Bethel by her father in 1901, but she was unable to produce it at the trial. Her husband, however, finally produced it in a mutilated form, and said that he had destroyed it as an instrument immediately after receiving plaintiffs' subpœna. After paying off the Bowery Savings Bank's mortgage of $150,000, and the taxes and other liens and expenses of the foreclosure, all amounting to $17,488.61, there remained out of the $183,000 a surplus of $1,093.03, which was subsequently distributed among certain creditors of the estate of Jacob Tallman, including the defendant Cornelius H. Tallman.

The plaintiffs thus got nothing out of this property, and, obviously, because the foreclosure and sale were manipulated by Jacobs and Tallman in their own interest and against the interest of these plaintiffs, with the result of giving the property to Tallman at an absurdly low price. Tallman remained in possession of the Soncy, and through his attorney, Jacobs, collected its rents for nearly two years after the sale, continuing to pay to the plaintiffs out of the income of the property $10 each week as before the sale. It was bought for $183,000, yet without difficulty Tallman was able to mortgage it for $200,000. All liens against it, and claims of creditors of the estate, had been cut off by the foreclosure, and out of the $200,000 loaned on mortgage they paid the purchase price of $183,000, and about $3,750 as brokers' fees for getting the White mortgage. This left in their hands about $13,250 out of the mortgages, which, doubtless, went to Jacobs and Tallman. When questioned about the disposition of this money, neither Tallman nor Jacobs recollected what was done with it. Their manner of testifying indicated a desire to conceal rather than a failure of recollection. The purpose of all this manipulation is shown in the testimony of Jacobs, who says that he and Tallman continued to hold the offer of the White loan of $175,000, so as to use it in case he or Tallman bought it in; that they were working to pay the judgment creditors of the estate; and that they could not do it if the property got into other hands. The result shows that no creditor was protected save Tallman and Jacobs. At this time Tallman held a claim of about

$61,000 against the estate, and Jacobs' claim amounted to about $12,-800. The surplus of $1,117.79 was all that was left to protect the creditors, and more than half of this went to defendant Tallman, and $163.22 went to the assignee of Michael Jacobs. From the evidence the conclusion is irresistible that the purpose of Tallman and Jacobs was to cut off all other creditors but themselves, to exclude these plaintiffs from any participation in the property, to buy it cheap, and then to raise enough money on mortgages to satisfy the claim of Jacobs against the estate, Tallman taking the property itself to satisfy him. Tallman testified that Jacobs reported to him that they would all be taken care of, provided the Soncy was bid in for less than $210,000, but that if it went above that all was up, and he (Tallman) would have to pay the brokerage on the $175,000 proposed loan of White. Although the deed was taken in the name of defendant Bethel, it is quite obvious that Tallman, and not Bethel, became the real owner. Tallman really paid the purchase price and raised all the money on the mortgages. He asked Poucher to do the bidding at the sale and allow his name to be used as buyer. For nearly two years after the sale Tallman had possession of the property, neither Bethel nor her husband going near the property for 18 months after the sale. For nearly two years after the sale he collected the rents through his attorney, Jacobs, who says that he never rendered any account to defendant Bethel because he had no occasion to do so; that he felt that he had to account to Tallman; and that in the collecting of the rents of the Soncy he was not acting for defendant Bethel. Moreover, I am convinced that both Tallman and Jacobs led the plaintiffs to believe that the property was to be bought in for their benefit, and that Mrs. Bethel took the title to protect their interest. This appears from the testimony of the plaintiffs as to statements made to them by Tallman and Jacobs. The truthfulness of their testimony on this point is emphasized by the fact that the plaintiffs for nearly two years after the foreclosure sale continued to receive $10 weekly out of the rents of the Soncy from Jacobs, as attorney from Tallman. The defendants claim that the sale was made in good faith to Mrs. Bethel, and that she became the real owner; that the property was not bought for Tallman, and that there was no violation of duty toward the plaintiffs on his part. They also claim that in the management of the affairs of the estate Tallman acted in every respect honestly and with a proper regard for the plaintiffs' interests, and that in every step taken by him he had the approval of the court in the form of its decrees and judgments. They assert that no harm was done the plaintiffs by the foreclosure sale of the Soncy, because all the other property proved insufficient to pay testator's debts, and the Soncy would have had to be sold in a surrogate's proceeding if the foreclosure sale had not taken place. In support of this contention the defendants have put in evidence the records of proceedings in two actions, one of which was brought by Stella Bethel for the partition of the testator's real estate not specifically devised, and the other brought by certain small creditors in the Surrogate's Court for the sale of the property specifically devised to these plaintiffs. In the latter proceeding the Rockland was sold, and a fruitless attempt was made to mortgage the Soncy. It is

true that the indebtedness of the estate at the time of the foreclosure sale to Bethel had been established by a judgment in the partition suit and a decree of the Surrogate's Court. But an examination of the record in those proceedings discloses a flagrant disregard by Tallman and Jacobs of the interests of those plaintiffs, and a purpose so to swell the indebtedness against the estate as to make inevitable a resort to the property specifically devised to these plaintiffs for the purpose of paying that indebtedness, most of which was made up of the claims of Tallman and Jacobs. The action in partition was brought January, 1893, by Stella Bethel for the partition of the parcels of real estate which had been devised, under the residuary clause of Jacob B. Tallman's will, to his nieces and nephews. The plaintiffs in this present action, having no interest in the subject-matter of the partition, were not made parties. On June 19, 1894, an order of reference was made in the partition action, with the usual provisions, and in addition thereto was the provision that the referee ascertain and report all the unpaid debts and obligations of deceased, and the amount due to each unpaid creditor, at the time of the report. In his report, on June 1, 1895, the referee found that the personal property of the decedent was insufficient to pay his debts, and that the unpaid claims against the decedent's estate were about $103,000. It is significant to note that this amount included a claim of $5,000 by Clarke & Nafis, and a claim of $11,031.04 by Jacobs, both for legal services rendered the executor Tallman. It also included a claim of $30,000 on a bond executed by decedent and his wife and defendant Tallman, the bond being secured by mortgage on land in Florida, purchased by deceased for $45,000. This latter claim afterward became the property of defendant Tallman, and, with his other claims established against the estate, made a total of about $68,000. On June 12, 1897, an interlocutory decree was entered confirming this report and, among other things, adjudging that Clarke & Nafis and Jacobs should be first paid their claims out of the net proceeds of the sale of the property in partition. The sale took place, and these gentlemen received from the referee for their professional services rendered the executor, Cornelius H. Tallman, $12,370, which was practically all of the proceeds of this sale. The claims of Clarke & Nafis and Jacobs were not legally provable or payable in the partition suit. They could not be a charge against the estate until allowed by the surrogate. Moreover, it is very doubtful whether any of the other general debts so proved could be established legally in the partition suit, and their payment directed to be made out of the proceeds of the sale, as was done here.

For the purpose of this suit it is not the intention, nor is it necessary, to attack this judgment in partition, though it is questionable whether the court had any authority in that suit to direct a sale of the decedent's real property for the payment of his debts. The Code of Civil Procedure at that time provided a proceeding in the Surrogate's Court for the sale of decedent's real estate for the payment of his debts. Section 1538. It has been held that the collection of debts from real estate of a decedent is not a part of the jurisdiction of a court of equity. "That right was conferred by statute, and it must be asserted and proved in the manner that the statute prescribes." Hogan v. Kavanaugh, 138

N. Y. 417, 422, 34 N. E. 292, 293. See, also, Jouffret v. Loppin, 20 App. Div. 455, 46 N. Y. Supp. 810; Long v. Long, 142 N. Y. 545, 552, 37 N. E. 486; Palmer v. Palmer, 3 App. Div. 213, 38 N. Y. Supp. 195; Underhill v. Underhill, 6 App. Div. 78, 39 N. Y. Supp. 468. The method adopted to establish the greater party of these claims for $103,000 before the referee made the task of Tallman an easy one. The items were proved by a seesaw process of testifying on the part of Michael Jacobs and Tallman, one helping the other to prove the claim of each, and each testifying to personal transactions with the deceased to prove his own and the other's claim, and in a proceeding in which these plaintiffs were not parties, and the effect of which ultimately stripped them of nearly every vestige of property devised to them under their grandfather's will, to the benefit of none save Jacobs and Tallman, who, naturally enough, is now become the real owner of the Soncy, although in the name of his daughter, Stella Bethel. During most of this time Tallman was the general guardian of both of these plaintiffs, and all the time occupied a position of trust with reference to them and their interest in the Soncy. Having thus established this large indebtedness of the estate in a solemn decree of the court, a proceeding is brought in the Surrogate's Court to bring about the sale of the Soncy and Rockland, which had been specifically devised to the plaintiffs, for the purpose of paying the balance of indebtedness of the estate. This proceeding was begun on July 11, 1895, on the petition of two small creditors of the decedent. Of course, plaintiffs here were made parties, and a guardian ad litem was appointed for them. A referee was appointed, and on the hearing the decree in the partition suit was received in evidence, with other testimony, as proofs of the claims against the estate. On April 2, 1896, the referee filed a report, in which he found, among other things, that in the partition suit a judicial inquiry was had as to the unpaid debts of said decedent, and that each and all of the debts so reported as proven and established before him was and were duly proven and established in said partition suit, and judicially determined by the interlocutory judgment therein, etc. The referee then finds to be due and owing to the creditors of the deceased upon their several claims about $108,000. In these proceedings the claims of Michael Jacobs, amounting to nearly $22,000, were proved by the decree in the partition suit, and by his own testimony as to his personal transactions with the deceased. Cornelius H. Tallman did not testify, but relied upon Michael Jacobs, his attorney, to establish his claim of $37,000, who did so by testifying to admissions made to him by the deceased a few days before his death. The claim of Franklin Head for $30,000 was proved by the bond executed by decedent and Cornelius H. Tallman, and its assignment to Head. Nothing was said about its being secured by a mortgage on Florida real estate, and so it was proved as an unsecured debt of deceased, in violation of section 2759 of the Code of Civil Procedure. This claim was afterward assigned to Cornelius H. Tallman, and by him assigned to his daughter, the defendant Stella Bethel, and thereafter it must have been reassigned, because he proved it in the surplus proceedings following the foreclosure of the Soncy, and in those proceedings he received his share on account of that claim. As a result of these proceedings the Rockland alone was

sold, and on March 10, 1897, a decree was made directing the distribution of the proceeds pro rata to the creditors. In these latter proceedings claims of nearly $108,000 were established against the estate, of which C. H. Tallman ultimately held $82,642 by assignment and otherwise, and the assignee of Michael Jacobs held $16,482. From the sale of the Rockland, Tallman received on account of his claim $19,-719.12, and Jacobs $6,924.66, so that at the time of the foreclosure sale the balance due on the Tallman and Jacobs claims together, including the balance of $24,906.83 still due on the Head claim, which had been assigned to Tallman, amounted to about $74,235.37. The Head claim of $30,000 could have been thrown out by proper objection made by Tallman, because it was secured by mortgage on Florida property. So, also, the large claim of Jacobs would have been thrown out on objection by the executor, since the only evidence to establish it was Jacobs' own testimony as to his personal transaction with the deceased.

I fail to see how the records of these proceedings help the defense in this action. On the contrary, they disclose conduct on the part of Tallman which, like his conduct in the foreclosure proceedings, prove and illustrate the same well-defined scheme to appropriate for himself and Jacobs the personal and real estate of the decedent, to the exclusion of the plaintiffs from any participation therein. The real estate not specifically devised was sold in partition, and the proceeds were paid illegally to Jacobs and Clarke & Nafis for services rendered the executor; the Rockland, which had been devised to these plaintiffs, was sold in a surrogate's proceeding, and practically all of the proceeds paid to Tallman and Jacobs; and, finally, the Soncy was sold in foreclosure for about 60 per cent. of its value, the defendant Bethel taking title undoubtedly on behalf of her father; and the plaintiffs are deprived of everything. Under these circumstances it would be inequitable to allow the defendants Bethel and Tallman to retain this property. Well-established rules of law require that the purchase by Tallman inure to the benefit of these plaintiffs (Dugan v. Denyse, 13 App. Div. 214, 43 N. Y. Supp. 308), and the defendant Bethel must be declared a trustee for the plaintiffs in respect to the Soncy. Judgment should be directed to this effect, and for a conveyance of the Soncy to the plaintiffs, free and clear of all liens upon the property except the mortgages for $175,000 and $25,000. The defendants Tallman and Bethel should account for and pay over to the plaintiffs the difference between $200,000, the amount of the two mortgages, and $183,000, the purchase price, and should account for all rents received, for which accounting a referee will be appointed. The brokerage fees and interest on the $175,000 loan paid before sale should not be allowed defendants. Costs to plaintiffs, and an allowance of $1,500.

Judgment accordingly.